IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENBNSLVANIA

VICTOR DARNELL THOMAS )
    Plaintiff, )
)
    v. )    Civil Action No: 3:20-cv-181-KAP
)
)
Federal Corrections Institution )
at Loretto: R.N. Martynuska, Medical )
Contractor; Norman Weidlich, H.S. Adm.; )
Kim Swindell, M.D.; Lt. Robinson; )
E. Bradley, Warden; (sued in his )
individual and official capacity); )
V. Moser, Warden (or her successor) )
(sued in her individual and official )
capacity); Taggart, A.W.; Robin Golden )
P.A.; Justin Bender, R.N.; C.O. )
Mclaughlin: S. Miles, Unit Manager; )
Wirfel, Case Manager; and, C.O. Murphy )
    Defendants. )
(All sued in their individual capacities)

**FILED**

FEB 1 1 2022

CLERK U.S. DISTRICT COURT
WEST DIST OF PENNSYLVANIA

PLAINTIFF'S THIRD

AMENDED COMPLAINT
JURY TRIAL DEMANDED

## PLAINTIFF'S THIRD AMENDED COMPLAINT

### PRELIMINARY STATEMENT

Victor Darnell Thomas (hereinafter "Plaintiff") received grossly inadequate medical care while in the custody of FCI Loretto authorities. Because of this lack of care, Plaintiff still suffers from pain in his epididymis with irreversible damage that ha a permanent effect on his quality of life.

On May 16, 2018, while incarcerated at FCI Loretto, Plaintiff had been placed in the Special Housing Unit ("SHU") as a result of prison authorities failure to protect and retailiation for adjudication of his constitutional rights.

Beginning July 12, 2018, until September 2, 2018, not only did FCI Loretto Health Services Staff, general custodians and Plaintiff's Unit Team ignore and ridicule his serious medical needs and constant scrotal pain, but they also subjected him to inhumane treatment, torture, brutality, psychological and

physical abuse that resulted in physical harm, which exacerbated Plaintiff's pain and caused him lasting permanent injury which exist as of the filing of this Second Amended Complaint on this 18th day of October, 2021.

On Sunday, September 2, 2018, Plaintiff had been extracted from SHU cell #8, denied a wheelchair by FCI Loretto Lt. Robinson.  Plaintiff was unable to walk and was drug down the remaining portion of the SHU hallway to the SHU medical room, at that time he vomitted his breakfast on Lt. Robinson and C.O. McLaughlin. Plaintiff begged to be taken to a hospital.

Prior to conceding to transport Plaintiff to the local hospital, Plaintiff informed Nurse Martynuska, Lt. Robinson and C.O. McLaughlin that he had been taken to a local hospital, in 2013, to the emergency room in Madera, California. At that time hospital staff informed him that he could have died if he had not arrived when he did.  Plaintiff has a history of "chronic epididymitis."  On September 2, 2018, Plaintiff specifically stated feeling the same way.  He stated, "I feel as though I'm going to die."

Martynuska and Lt. Robinson called Plaintiff a liar, stating he was faking. Martynuska stated, "I'm only sending him because I don't want to put up with this all night.  They will give him the same medication we have and he'll be back tonight.  Thomas, I did a quick glance at your medical file, and I didn't see anything in your background of epididymitis.  You're just faking it."

Contrarily however, Plaintiff subsequently did in fact spend **twenty-five** (25) days in the hospital as he arrived in "septic shock."  As a direct and proximate cause of the actions and inactions be each of the Defendants, individually and in conspiracy with one another, Plaintiff was denied and delayed medical attention for **fifty-two** (52) days in contradiction of the Eight Amendment of the United States Constitution.

Plaintiff ask this Court, after due proceedings, to declare and a judgment be entered in his favor for all reasonable compensatory, nominal and punitive damages concerning the civil rights violations and violations of his rights under the First, Fifth, Eighth and Fourteenth Amendments of the United States Constitution.

## I.
### JURISDICTION

1. Plaintiff brings this lawsuit pursuant to 42 U.S.C. § 1983 and Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999 (1971). This Court has Jurisdiction under 28 U.S.C. §§ 1331 and 1343.

## II.
### VENUE

2. The Western District of Pennsylvania is an appropriate venue under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III.
### PARTIES

3. Victor Darnell Thomas ("Plaintiff"): Victor Darnell Thomas is a Fifty-seven (57) year old African American, born in the city of Altoona, Pennsylvania. A former professional basketball player and candidate for the Mayoral seat and city council. Prior to Plaintiff's arrival at FCI Loretto in 2016, he had been incarcerated since 2001, with no misconduct reports and a good attitude and willingness to help his fellow inmates. This latter information is reflected in his institutional record and attached memorandums. Owing to the attached memorandums by Case Manager(s) R. Rouleau and Kelly Jordan, during Thomas' incarceration he has been an inmate suicide companion, teacher's aide and law clerk, Inmate Thomas had completed over thirty-five (35) programs and obtained college certification in building construction, Heating Ventilation and Air

Conditioning, as well as, a Personal Fitness Trainer.

4. During Thomas' incarceration he has served as inmate Pastor as a duty to set an example, he has worked throughout his prison life to better the prison community through conducting Bible Study classes, Education and GED Tutoring and a Mentor Program. Plaintiff has paid the price of his dedication: he has been harassed and targeted by inmates (and allegations herein by staff) in violation of his First Amendment right to exercise his religious beliefs. FCI Loretto Staff failed in its duty to protect and provide a safe environment through, inter alia, employment in the institutions leisure library was exclusive to inmates with sex assault or pedophile cases. These conditions and others resulted in a divided and racial doppler effect which precipitated a wrongful placement of Plaintiff in the Special Housing Unit ("SHU").

5. Defendant: R.N. Martynuska (hereinafter "Martynuska"). During relevant time of this Complaint, she was employed as the Federal Correction Institution at Loretto ("FCI Loretto") in the medical department. It is unknown if she is a private contractor. She provided medical services at FCI Loretto, including to Plaintiff.

6. Defendant: Norman Weidlich ("Weidlich"). During times relevant to this Complaint, he was the Health Care Administrator employed at FCI Loretto. He was responsible for the direct provision of medical care to inmates at FCI Loretto, including Plaintiff. It is unknown if he is a private contractor.

7. Defendant: Kim Swindell, M.D.: ("Swindell"): During times relevant to this Complaint, he was employed at FCI Loretto. It is unknown whether he is a private contractor. During times relevant to this Complaint, he provided medical services at FCI Loretto, including to Plaintiff.

8. Defendant: Lieutenant Robinson/Robison ("Robinson") During times relevant to this Complaint, he was employed at FCI Loretto and acting shift commander on

September 2, 2018.

9. Defendant: E. Bradley ("Bradley")(sued in both his individual and official capacity) during times relevant to this Complaint, he was employed at FCI Loretto as the Warden (until replaced by V. Moser). Bradley had legal custody of Plaintiff. He had actual knowledge of violations of Plaintiff's constitutional rights and knew of the practices that led to them. He did not act to curb or stop them. He created, maintained and implemented policies or customs allowing or encouraging these unlawful acts.

10. Defendant: V. Moser ("Moser")(is sued in both her individual and official capacity, or her successor) During critical times relevant to this Complaint, Moser was the Warden of FCI Loretto. (same as #9).

11. Defendant: A.W. Taggart ("Taggart") During times relevant to this Complaint, he was an employee at FCI Loretto as the Associate Warden. He had actual knowledge and created orchestrated violations of Plaintiff's constitutional rights and knew of the practices that led to them. he did not act to stop or curb them. he created, maintained and implemented policies or customs allowing or encouraging these unlawful acts.

12. Defendant: P.A. Golden ("Golden") During times relevant to this Complaint, she was an employee at FCI Loretto as a Physicians Assistant. She was responsible for the direct provision of medical care to inmates at FCI Loretto, including Plaintiff. It is unknown whether she is a private contractor.

13. Defendant: Justin Bender, R.N. ("Bender") During times relevant to this Complaint he was an employee at FCI Loretto in the medical department. It is unknown if he is a private contractor.

14. Defendant: C.O. McLaughlin ("McLaughlin") During times relevant to this Complaint, he was an employee at FCI Loretto as a corrections officer.

15.   Defendant: S. Miles ("Miles"), During times relevant to this Complaint, he was an employee at FCI Loretto as a Unit Manager. He had actual knowledge of the violations of Plaintiff's constitutional rights. He did not act to stop or curb them.

16.   Defendant: Wirfel ("Wirfel") during times relevant to this Complaint, he was an employee at FCI Loretto as a Case Manager. He had actual knowledge of violations of Plaintiff's constitutional rights. He did not act to stop or curb them.

## IV.
## EXHAUSTION OF ADMINISTRATIVE REMEDIES

17.   Plaintiff sought to exhaust his administrative remedies as required by policy. Plaintiff follows this rule in order to seek help for relief from his pain and suffering.  Plaintiff, while at FCI Loretto, received no help in his quest to receive review of his administrative remedies both Defendant Miles and Wirfel would not provide him grievance forms for purpose of obtaining adequate diagnosis and antibiotics he was seeking.

18.   Subsequently, Plaintiff received a retaliatory transfer from FCI Loretto to FCI Berlin. At that time, he filed administrative remedies.  In support of exhaustion, Plaintiff has caused to be forwarded to this Court a memorandum by FCI Berlin's Case Manager Mr. Rouleau. (Doc. #12)(A copy is herein attached).

## V.
## FACTUAL ALLEGATIONS

BACKGROUND OF MEDICAL HISTORY

19.   The forthcoming factual allegations are herein plead with particularity pursuant to Fed.R.Civ.P., Rule 26.

20.   In 2006, prior to Plaintiff being transferred to federal custody, while he was incarcerated at the State Correctional Institution at Albion, Pennsylvania, he was initially diagnosed with epididymitis.  Subsequently,

Plaintiff immediately received diagnostic test and antibiotics for his left testicle on two separate occasions.

21. In 2009, Plaintiff was transferred into federal custody designated to the Federal Corrections Institution at Beaumont, Texas. Plaintiff's medical records denoted at that time: (a) A Prosthetic devise as a result of a S/P left hip full arthroplasty. He needed a hand-held metal scanner when entering doorways and bottom bunk status; (b) Plaintiff has a upper partial plate; and (c) Plaintiff requires bottom bunk status.

22. On March 30, 2012, Plaintiff was redesignated to the Federal Corrections Institution at Mendota, California.

23. On June 15, 2012, Plaintiff, reported to the Health Services Department in the prison. The night before he began to experience medical problems which he recognized as symptoms of epididymitis, in his right testicle and his lymph nodes were swollen. FCI Mendota's Medical Staff expeditiously and adequately diagnosed epididymitis and orchitis in Plaintiff's right testicle. Immeidiately, Michel Talty prescribed a cefTRIXAone Injection of 1 gm, which he administered into Plaintiff's Gluteal muscle; Ciprofloxacin, 500 mg, two times daily for 10 days; and Acetaminophen/Codeine 300/30 mg, two times daily.

24. On November 12, 2013, Plaintiff again deduced the symptoms of epididymitis in his right testicle. He then reported to the health Services Department at FCI Mendota. Following adequate diagnostic testing, both blood and urine testing, FCI Mendota's M. de Masi P.A., appropriately concluded Plaintiff's condition to be an emergency. Plaintiff was immediately transported to the local emergency room in Madera, California.

25. Madera Hospital's Dr. Thomas (no relation to Plaintiff) ordered additional blood tests and an ultrasound. Accordingly, Dr. Thomas diagnosed and prescribed antibiotics for Plaintiff's recurrent epididymitis.

26.  Respective to follow-up and a PLAN OF CARE, corollary to Dr. Thomas' cogent directives, FCI Mendota's Caleb Querol, M.d., Clinical Director colloborated with Dr. Thomas and counselled Plaintiff on the necessity to seek immediate medical attention, for any future epididymitis flare-ups.  Plaintiff was told, if he had not arrived at the hospital when he did, he could have died.

## FEDERAL CORRECTION INSTITUTION LORETTO

27.  In 2016, Plaintiff arrived at FCI Loretto a low level institution located approximately fifteen miles west of Altoona, Pennsylvania.  Plaintiff's original home city and release residence.  He had received no incident reports during his fifteen years of incarceration.

28.  However, on May 15, 2018, Plaintiff and another inmate were placed in the Special housing Unit ("SHU") after an alleged physical confrontaiton.

29.  On July 2, 2018, Plaintiff informed FCI Loretto Medical Staff that he was currently experiencing severe scrotal pain and swelling of his right testicle.  Plaintiff further stated, after a 2013 epididymitis infection which necessitated his visit to a local hospital, he had been cogently directed by Madera Hospital's Dr. Thomas and FCI Mendota's Dr. Caleb Querol that his recurring epididymitis would require immediate medical attention.

30.  On or about the early morning of July 12, 2018, Plaintiff observed Defendant P.A. Golden making her sick call rounds in the SHU.  Plaintiff informed Defendant Golden that he was experiencing scrotal pains associated with his Chronic epididymitis.

31.  Plaintiff unequivocally informed Defendant Golden that his current symptoms of pain matched those which previously lead to his being rushed to a local hospital in Madera, California.  In response, Defendant Golden promised to extract him for an examination and to provide antibiotics.  Plaintiff was extracted from his SHU cell, but was not given the promised antibiotics.

32. Defendant Golden's diagnostic examination entailed a blood pressure and temperature test. As a result, Defendant Golden prescribed 56 tab of acetaminophen. Defendant Golden denied Plaintiff's request for blood testing, and her promise for antibiotics. She stated to revisit the issue in two weeks. He was unable to receive adequate or timely medical care.

33. On July 19, 2018, in response to Plaintiff's documented cop-outs and sick-call slips, Defendant R.N. Bender extracted him from SHU cell #8 in the presence of his cellmate/witness Robnell Carter.

34. Plaintiff's medical need was extemely serious. These factors were conveyed to the Federal Individual Defendants when:

a. Plaintiff complained of scrotal pain associated with his chronic epidiymitis and symptoms which resulted in his previous trip to a local hospital in 2013;

b. Plaintiff made constant request for medical care, and, in response to his request for confirmation of his written request Defendant Bender adviced that Defendant Weidlich had filed them;

c. Defendant Bender stated he was aware of the serious risk of harm for delayed treatment of Plaintiff's epididymitis;

d. Plaintiff's cellmate informed Federal Individual Defendants of Plaintiff's insomnia, moaning in pain and that Plaintiff had lost a large amount of weight over a short period of time;

e. Bender's visual examination evoked his response that his right testicle was red and swollen larger than the left. "A serious medical need that had been previously diagnosed by a physician...and one that even a lay person would recognize..."

35. Bender then conducted a urinalysis test and erroneously concluded that Plaintiff was suffering from a urinary tract infection. Following exclusively

Defendant Bender's diagnosis, Defendant Swindell prescribed 14 tabs, 160 mg. sulfamethoxazole/trimethoprim 500 mg/160 ml tab.

36.   Following issuance of this prescription and the acetaminophen, Plaintiff's pain was not alleviated.   Despite Plaintiff's numerous request thereafter, no additional antibiotic nor stronger pain killer was administered.

37. From that date, a thirty-seven (37) day delay ensued wherein Plaintiff received no antibiotics until he was transported to the local hospital on September 2, 2018.

38.   This is telling of deliberate indifference.  On Sunday, August 5, 2018, as a result of additional written and verbal protestations of denial/delay of adequate medical care by Plaintiff, Defendant Bender then conducted a second urinalysis test.   Subsequently thereafter, he promised to give Plaintiff an additional 14 tabs of sulfamethoxazole from his "night stock."  However, he then reversed his position indifference to a directive by Defendant Swindell.  As far as the record reveals, Swindell relied exclusively on Defendants Bender and Golden's diagnosis, at no time did Swindell visit Plaintiff, nor, did he respond to Plaintiff's written submissions requesting, inter alia, antibiotics.

39.   As a consequence, Plaintiff did not receive adequate medical care for fifty-two days after his initial examination.   Thus, he was in "septic shock" when he was eventually transported to the local hospital.  Plaintiff remained hospitalized for twenty-five (25) days and he now has permanent pains in his testicles and epididymis.

40.   The forthcoming factual allegations occurred prior to Plaintiff's emergency room visit:

a.  Plaintiff began to suffer severe abdominal and back pain in addition to his already severe scrotal and testicular pain;

b. On September 2, 2018, SHU custodian Salyards arrived at Plaintiff's cell, only as a result of all his fellow inmates screaming for assistance. This saved Plaintiff's life. There are no panic buttons in FCI Loretto;

c. Upon arrival to SHU cell #8, Plaintiff informed Defendant Martynuska, that, despite his having taken 8-10 acetaminophen in the past two hours -- he had severe pain and could not even turn over in bed;

d. Martynusaka told plaintiff she would check his medical records regarding his assertion of having chronic epididymitis and, she would check back in the evening;

e. Plaintiff, unable to bare the pain, only several hours later, he again begged fellow inmates to summon SHU custodian Salyards. Thank Jesus! Salyards was the only staff member to show compassion;

f. Defendants: Martynuska, Lt. Robinson and McLaughlin arrived, Martynuska elicited a contention that of disbelief, asking how Plaintiff had become "so sick so fast,' and she and Robinson accused Plaintiff of "faking" and "lying.";

g. Martynuska departed. Lt. Robinson threatened to leave Plaintiff in his cell unless he stood and was handcuffed behind his back. Plaintiff's request for a wheelchair was denied;

h. Plaintiff's cellmate assisted him in standing and being cuffed, which was done in a forceful manner to cause Plaintiff additional pain -- so much that Plaintiff screamed out in pain. After being extracted from his cell, owing to video footage, Plaintiff was unable to walk, Lt. Robinson and McLaughlin dragged Plaintiff about three quarters of the way down the SHU corridor, until Plaintiff fell to his knees in excruciating pain;

i. Fellow inmates screamed at the Defendants to "stop treating him like an animal" to no avail, the Defendant's torturous conduct was not abated by the screams however;

j. Martynuska, whom was positioned and watching in the SHU doorway, then lifted Plaintiff's ankles and helped carry him into the SHU medical room for an examination;

k. Plaintiff then vomitted upon Defendants Robinson and McLaughlin;

l. Martynuska lied saying, "Thomas I reviewed your medical record and no history of chronic epididymitis exist, you are lying...";

m. After traversing to the general population medical department to await an ambulance, Plaintiff was left alone with Defendant Lt. Robinson;

n. At that time, Robinson called Plaintiff a "scumbag nigger drug dearler." Plaintiff, at that time, still handcuffed behind his back and in agonizing pain, was no threat, and he endured a sadistic assault by Defendant Robinson, whom then punched Plaintiff in the side of his head.  Thereafter, Defendant Robinson threatened that he and his friends would further beat him whenever he returned to general population;

o. Defendant Robinson further  exacerbated his racist paradigm, stating that Plaintiff was the type who liked to file grievances on "good white corrections officers...but, Plaintiff wasn't going to get any money and that nothing would be done."

p. Defendants McLaughlin and Murphy returned to the medical room, Plaintiff was tortured when they forcefully removed his socks and shoes.  Removal of Plaintiff's foot-ware was a premeditated forethought by Defendant Robinson, this is so because, whenever Plaintiff was discharged from the hospital that night, he ahd to walk nearly 100 yards while bare foot over dirty and rough concrete to arrive at the prison vehicle.  Both Defendants McLaughlin and Murphy conceded to never having removed an inmates socks and shoes during a transport, this was a first.

41.   Each of the Federal Individual Defendants had signed an

affirmation/oath form 61, swearing to uphold the constitution. They lacked penological/or security justification to treat Plaintiff in the manner as described above during his fifty-two (52) day delay for adequate medical care.

a. Each of these Federal Individual Defendants acted with deliberate indifference to the Plaintiffs health and safety.

b. Plaintiff's medical need was so obvious that even a lay person would easily recognize the necessity for immediate medical intervention.

c. Despite all of this these Federal Individual Defendants failed to provide adequate medical care to Plaintiff for an additional thirty-eight days, from July 26, 2018 until September 2, 2018, all Federal Individual Defendants ignored Plaintiffs verbal and written request.

FIRST CAUSE OF ACTION
Bivens Claim for Unconstitutional Medical Care

Plaintiff was subjected to Cruel and Unusual Punishment in Violation of the Eighth Amendment of the United States Constitution

42. Plaintiff incorporates by reference each and every allegation contained in paragraph 1 through 41 as if set forth fully herein.

Defendants: Martynuska, Robinson, Bradley, Moser, Taggart, Golden, Bender, Swindell, Weidlich, Wirfel, and Miles.

## A. Serious Medical Need

Plaintiff has a history of chronic epididymitis, which dates back to 2006, his initial diagnosis occurred while he had been incarcerated at SCI Albion, Pennsylvania. During the span of 2006 to 2009, Plaintiff endured three (3) epididymitis flare-ups. Plaintiff was transferred from state to federal custody on May 13, 2009.

43. Prior to his May 13, 2009 transfer from state to federal custody, contemporaneous to the time of 2006 - 2009, Plaintiff received adequate and immediate same day medical care to his left testicle, on three (3) separate occasions while in state prison(s):

44. On March 29, 2012, Plaintiff had been redesignated from FCI Beaumont, Texas to FCI Mendota, California. On June 15, 2012, Plaintiff reported to the Health Service Department in the prison. The night before he began to experience a medical problem which he immediately recognized as epididymitis, for the first time in his right testicle. Subsequently, FCI Mendota's Michael Talti, P.A., expeditiously diagnosed and treated with antibiotics. Attached herein as Appx, "A," three pages of BOP medical records of 6/15/2012;

45. On November 12, 2013, Plaintiff again deduced he was experiencing

symptoms of epididymitis in his right testicle and pain in his scrotal area. Following blood and urine tests, FCI Mendota's M. de Masi, P.A., appropriately concluded Plaintiff's condition to be an emergency. He was immediately transported to the local emergency room in Madera, California. Attached herein as Appx. "B," are copies of BOP medical records of 6/12/2013, a total of six pages. At that time Plaintiff received extensive counselling regarding his chronic epididymitis and steps to take for future flare-ups. Page 5 of 5 denotes under "other" Plaintiff was made aware of the need to seek immediate medical care, pursuant to a careful discussion regarding "Plan of Care." Pursuant to the cogent directive from Madera Hospital's Dr. Thomas and BOP's Caleb Querol, M.D., Clinical Director;

46. On November 15, 2013, Dr. Caleb Querol conducted a follow-up examination. Attached herein as Appx. "C," is a copy of BOP medical records of 11/15/2013;

47. Attached herein as Appx. "D," are copies of two medical reports on epididymitis. The first by Charles Patrick Davis, M.D., PhD. (Pp. 1-3) and a Mayo Clinic Report for the same topic. Both reports stress the urgency for immediate medical treatment to avoid permanent damage.

## B. Official Knowledge of Need

48. On July 2, 2018, Plaintiff began experiencing the following symptoms of epididymitis: pain in his scrotal area, frequent urination with a slight buring sensation and milky/particles in his discharge of urine. Plaintiff then made frequent verbal request for medical care and to see a doctor;

49. On July 12, 2018, Plaintiff observed Defendant Golden making her sick call rounds in the SHU area. Plaintiff unequivocally asked Golden for antibiotics as he had been previously counselled to so do, by Dr. Thomas and Dr. Querol. Plaintiff informed Golden of all the claims in subparagraph

"i," he detailed how it lead to a previous emergency room visit;

50. Defendant Golden promised to extract him from his SHU cell and give him antibiotics. Though he was extracted he was given no antibiotics. Defendant Golden then prescribed 56 tabs of acetaminophen;

51. On July 19, 2018, Defendant Bender, upon information and belief to, inter alia, Plaintiff's previously documented inmate request to staff forms and sick call slips, then extracted Plaintiff from SHU cell #8, in the presence of his cellmate/witness Robnell Carter.

52. Attached herein as Appx. "E," is a copy of Plaintiff Inmate Request to Staff of July 18, 2018. Plaintiff, between the time of July 2, 2018 until September 2, 2018, submitted eight written request seeking medical care. Plaintiff request herein unambiguously served to put on notice his request for antibiotics to treat his chronic "epiditimitus" [sic]. Furthermore, said request alerts medical staff of his symptoms, while having acknowledged the previously prescribed acetaminophen;

53. Defendant Bender's diagnostic examination included his having conducted a UA, as well as, a visual examination. Bender's examination evoked a verbal response, that Plaintiff's right testicle was noticeably larger than the left, and, that Plaintiff made facial grimaces during the genital exam;

54. Plaintiff's medical need was so obvious that even a lay person would easily recognize the necessity for medical intervention.

55. Plaintiff's medical need was extremely serious. These factors were conveyed to the Individual Federal Defendants when:

a. Plaintiff complained of scrotal pain, as previously diagnosed and directed to so do by Dr. Thomas and Dr. Querol;

b. Plaintiff made constant request for antibiotics and to see a doctor. Defendant Bender confirmed that Plaintiff's written request had in fact been

received, that Defendant Weidlich had filed them;

c. Defendant Bender states he was aware of the risk of harm to Plaintiff as a result of delayed treatment of epididymitis and, specifically Plaintiff's assertion of having been previously diagnosed by a physician;

d. Plaintiff's cellmate Robnell Carter informed Federal Individual Defendants of Plaintiff's insomnia, moaning in pain and excessive loss of weight over a short period of time;

e. Bender then conducted a urine test and erroneously concluded Plaintiff was suffering from a urinary tract infection;

f. Precipitated exclusively on Bender's diagnosis and using him as a "gatekeeper," Defendant Swindell prescribed 14 tabs 160 mg. sulfamethoxazole/trimethoprim 500 mb/160 ml tab;

g. Following issuance of this prescription and the acetaminophen, neither Plaintiff's pain nor infection was alleviated. Despite Plaintiff's numerous daily request thereafter, no additional antibiotic nor stronger pain killer was administered. The Defendant's prescribed treatment was so woefully inadequate as to amount to no treatment at all.

## C. Failure to Provide Treatment

56. On or about Sunday, August 5, 2018, as a result of Plaintiff's written and oral protestations that medical was being denied/delayed in violation of his constitutional rights, Defendant Bender then conducted a second UA.

57. Subsequently, Bender promised to provide Plaintiff an additional 14 tabs of sulfamethoxazole, which he had in possession in his "night stock."

58. As to the claim in subparagraph #56, Bender then reversed his course and denied Plaintiff additional antibiotics and his Eighth Amendment right to medical care. According to Bender, Defendant Swindell directed Plaintiff to write to him, and then, Swindell would contact the CDC. Despite reservations, Plaintiff accordingly wrote to Defendant Swindell on no less than three (3) separate occasions with negative response.

59. As such, using as a start date, the last day Plaintiff received any antibiotic, was July 26, 2018 until Plaintiff was taken to the hospital on September 2, 2018, during that thirty-eight (38) day period, Plaintiff continued to suffer and his repeated written and verbal request to all the Individual Federal Defendants, whom passed his SHU cell, especially medical staff, either went unanswered or, they elicited a response "next time don't come to prison."

60. Herein is the crux of the deliberate indiffence claim, Defendants denied all antibiotics nor was he given a stronger pain killers during this 38 day period. Notwithstanding all the Defendants had signed an affirmation form 61, to uphold the constitution. Yet, they were all advised of Plaintiff's unnecessary suffering and did nothing to curb this constitutional violation.

61. Thus, between the intervening time of July 26, 2018 until September 2, 2018, Plaintiff made daily request for medical care and his constitutional rights to all the Individual Federal Defendants;

62. All Federal Defendants signed an affirmation/oath form 61 to uphold the constitution and to not strike against the United States Government;

63. As to claim in subparagraphs "58" and "59" Defendant Bender denied Plaintiff's request during this time, indifference to Swindell's directive, stating that "he could only follow orders," despite Bender's acknowledgement that delay of epididymitis could cause permanent injury or death;

64. As a direct and proximate cause, Plaintiff experienced unwanton pain and suffering for the entire month of August 2018.  Plaintiff was unable to obtain medical attention, despite the previous directives from doctors. Owing to the enclosed BOP medical records, that Plaintiff's condition required immediate medical intervention and antibiotics to avoid permanent harm or death;

65. Contemporaneous to this same time, Defendant Golden acted with deliberate indifference to Plaintiff's request for medical care;

66. Owing to Appx. E, of 7-23-18, Golden instructed Plaintiff  to "Report continued symptoms as needed."  However, in contrast to her written response, Golden denied Plaintiff's request to conduct further examination and provide medical care;

67. While conducting her sick call rounds, Golden told Plaintiff he is a "crybaby" and that he should just "suck it up."  On numerous occasions, Defendant Golden would ignore Plaintiff's cries for help and just walk by his cell.  Despite Plaintiff's further request, Defendant Golden refused to arrange for any follow-up care for his chronic epididymitis;

68. The initial cursory treatment given to Plaintiff amounted to no treatment at all in violation of Plaintiff's rights under the Eighth Amendment, this was inhumane treatment.  There existed no medical reason for further delay, nor, for Plaintiff to have to write Dr. Swindell for him to

contact the CDC

69.a. Defendants: Miles, Wirfel, Bradley, Moser, Taggart:

i. Between the intervening time of July 26, 2018 until September 2, 2018, Plaintiff made weekly request for medical assistance and violation of his Eighth Amendment Rights to his unit team, Miles and Wirfel, as well as, the aforementioned Individual Federal Defendants;

ii. All the Defendants had signed an affirmation/oath form 61 to uphold the constitution, and, inter alia, not strike against the United States Government;

iii. The Defendants were indifferent to Plaintiff's request for his constitutional right to not be denied medical care;

iv. During the same time, Plaintiff voiced numerous times his constitutional rights were being violated and, he asked Miles and Wirfel for greivance forms, his request were denied;

v. Defendant Miles replied to Plaintiff's request by telling him that he could obtain them from his prison counselor, but, that it "was a waste of time, paper and ink, because the medical department's decisions are final.";

vi. Defendant Wirfel refused to issue a greivance form after numerous request, and further refused to take Plaintiff's grievances forms on other matters;

vii. Defendant Wirfel ignored Plaintiff's numerous request and walked away from his SHU cell as if he didn't hear Plaintiff's request;

b. Defendants: Weidlich, Martynuska, Bender

i. Defendant Weidlich's direct personal involvement violated Plaintiff's Eighth Amendment Constitutional rights by virtue of systemic deficiencies respective to medical records of Plaintiff's Chronic epididymitis.

ii. Defendant Weidlich, a non-medical employee, had a due process and statutory duty pursuant to BOP policy, whenever Plaintiff arrived at FCI, Loretto an "Inmate Intra-System Transfer form should have been generated which would have revealed Plaintiff's Chronic epididymitis condition. New inmates undergo "medical screening" to determine both infectious and non-infectious diseases.

iii. The asserted testimonial evidence herein shows, Defendant Martynuska stated, "Thomas, I reviewed your medical records there is no mention of epididymitis, you are faking."

iv. Here, the evidence shows that either Defendant Weidlich failed in his constitutional and statutory systemic duty or Defendant Martynuska elicited disingenuous statements.

v. Attached herein as Appx. "F," are copies of Affidavits by fellow SHU inmates Byron Moody (Reg. No. 16957-055) and Christopher Casco-Caballos (Reg. No. 16641-374), both inmates submitted

affidavits which detailed their versions of events which occurred on September 2, 2018. Defendant Martynuska's contentions, denote Weidlich's actions or inactions, a posteriori, a constitutional violation respecting systemic deficiency of his duties to maintain medical records.

vi. Defendant Weidlich purposefully and fraudulently misrepresented and/or concealed Plaintiff's medical records and his submission of written request for medical care, antibiotics and to see a doctor.

vii The asserted testimonial evidence herein shows, Defendant Bender stated, "Weidlich received all of your [Plaintiff's] eight written request and placed the same in his file." However, attached herein as Appx "E" is the only copy in the medical records of the eight written request.

viii. Weidlich was responsible for special medical needs that raise special concerns for inmates. Defendant Weidlich's was personally involved in this matter, although Weidlich did not make the final decision to deny antibiotics to Plaintiff for the aforementioned additional thirty-eight (38) days, he did not take actions to protect Plaintiff. Weidlich was in a position to effect the decision by Defendant Swindell, whom instructed Defendant Bender to provide no further antibiotics nor pain meds.

ix. Defendant Weidlich provided false and misleading accounts of material facts as they occurred in this matter.

x. Attached herein as Appx F(1) is a copy of an Administrative Remedy Informal Resolution Form - Response of October 11, 2018 by Defendant Weidlich.

xi. Plaintiff's medical records rebut Defendant Weidlich's contentions.

xii Each of these Federal Individual Defendants owed a duty to Plaintiff while he was in their care, custody and control to speak, through their actions as well as words, and reveal truth as witnesses and perpetrators of the events surrounding Plaintiff's medical records and written request for immediate medical care, antibiotics and doctor visit.

### D. Causation and Injury

i. As a direct and proximate result of all the Defendants failure to provide treatment for the thirty-eight (38) days, from July 26, 2018 until September 2, 2018 caused unnecessary pain and suf-

fering to Plaintiff. All of the Federal Individual Defendants continued with this course of conduct, despite Plaintiff's continued pleas for help and visible indications of extreme pain. All of the Defendant's actions or inactions caused Plaintiff extreme physical pain and emotional distress. The delay of treatment (38) days exacerbated Plaintiff's infection further and permanently. As of today, Plaintiff still has constant pain in his right testicle.

ii. Plaintiff will have to live in permanent pain in post-incarceration life. Plaintiff is currently incarcerated at FCI Berlin, who has transported him to outside prison doctor visits. Attached herein as Appx "G," are copies of BOP medical records for Plaintiff.

iii. On March 19, 2020, Plaintiff was taken to Androscoggin Valley Hospital as a result of constant pain and Plaintiff's concern of testicular cancer. Attached herein is a copy of Dr. Maurice Dennery's Assessment and Plan. Plaintiff will experience pain in his testicle and epididymis on normal occasions, but also, he experiences extreme pain during sexual climax.

iv. Each of the Federal Individual Defendants acted with deliberate indifference to the rights, health, safety, and welfare of the Plaintiff.

v. As a direct and proximate result of the Federal Individual Defendant's actions and inactions described herein, Plaintiff incurred tremendous pain and suffering, mental anguish and Plaintiff almost died.

vi. The conduct of each of the Federal Individual Defendants constitutes deliberate indifference, deprovation of basic human needs and callous disregard of Plaintiff's constitutional rights, entitling Plaintiff to punitive damages.

## SECOND CAUSE OF ACTION
Bivens Claim for Unconstitutional Medical Care

Plaintiff was subjected to Cruel and Unusual Punishment in Violation of the Eight Amendment to the United States Constitution.

70. Plaintiff incorporates paragraphs 1 through 69 as though they were stated fully herein.

71. Defendants: Martynuska; Lt. Robinson; Weidlich; Swindell; Bradley; Moser; Taggart; Golden; Bender; McLaughin; John doe #3; Health Severices Nurses: Miles and Wirfel.

### A. Deprivation of Basic Human Needs

72. Each of the Defendants had notice of Plaintiff's serious medical needs for immediate treatment of his "Chronic Epididymitis, inter alia, by virtue of his medical records and, beginning on July 12, 2018 until September 2, 2018, Plaintiff photocopied and submitted at least four (4) "Inmate Request to Staff" ("cop-outs") and four (4) separate sick call request. In addition Plaintiff verbally requested medical assistance from medical staff, SHU custodians and his Unit Team Staff. Plaintiff categorically informed all Defendants of severe risk or harm to his person as a result of his chronic epididymitis and, he then requested for staff to review his medical records, specifically, his trip to the emergency room in 2013, to the Madera Hospital.

### B. Officials Knowledge of Deprivation

73. All the Defendnts had an opportunity to prevent and remedy, the injurious violations of Plaintiff's constitutional rights and Basic Human Rights. All Defendants knew of, but elected to ignore, Plaintiff's serious medical needs, when they denied and delayed care, which had been previously diagnosed and

treated by hospital practioners, that even, mild scrotal pain, as experienced by Plaintiff in the early stages, combined with urinary symptoms, or any other symptoms of epididymitis merit a visit to a health care practioner because treatment for epididymitis involves prescription antibiotics.

## C. Official Failure to Provide Treatment

74. Weidlich, Swindell, FCI Loretto Administrators and Staff failed to properly supervise their subordinates, which resulted in unconstitutional medical care to Plaintiff. Weidlich, Swindell, FCI Loretto Administration and Staff knew of the violations of Plaintiff's Constitutional rights and refused to do anything to rectify the violations. Furthermore, they implemented and maintained a policy or custom of allowing or encouraging these unlawful acts.

## D. Causation and Injury

75. Each of the Defendants acted with deliberate indifference to the constitutional rights, health, safety and welfare of the Plaintiff. As a direct and proximate cause of the Defendant's actions as described herein, Plaintiff remained hospitalized for twenty-five (25) days, he incurred tremendous pain and suffering, mental and emotional pangs and anguish, permanent and constant pain in his epididymis.

## THIRD CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

76. Plaintiff was subjected to Intentional Infliction of Emotional Distress violating Plaintiff's constitutional rights to be free from Cruel and Unusual Punishment under the Eighth Amendment to the United States Constitution.

77. Plaintiff incorporates paragraphs 1 though 75 as though they were stated fully herein.

78. Defendants: Martynuska, Lt. Robinson, Weidlich, Swindell, Bradley, Moser, Taggart, Golden, Bender, Miles and Wirfel.

## A. Deprivation of Basic Human Needs

79. Each of the Defendants by extreme and outrageous conduct intentionally or recklessly caused Plaintiff severe emotional distress and severe bodily harm. All the Defendants had knowledge of Plaintiff's past and current Chronic Epididymitis flareups.  Plaintiff advised FCI Loretto Staff both by writing and verbally, beginning on July 12, 2018 and continuing through September 2, 2018.

## B. Officials Knowledge of Need

80. All the Defendants knew of Plaintiff's serious medical needs via either written or verbal communications, seeking immediate access to a health care Practitioner for purpose of having him prescribe Doxycycline for his chronic epididymitis flareup.

## C. Officials Failure to Provide Treatment

81. Additionally, after subjecting Plaintiff to a Fifty-two (52) day delay, before he was rushed by ambulance to the local hospital, Plaintiff's condition, it was determined and stated by Dr. Jessica Shepherd that he was in "septic shock." According to a Mayo clinic report, the mortality rate for septic shock is 50%.  Another statistical fact which Plaintiff informed FCI Loretto authorities from July 12, 2018 until September 2, 2018.

## D. Causation and Injury

82. Ultimately, as a result of the Fifty-two day delay by FCI Loretto authorities, in January of 2020, during a subsequent out-patient visit to a local hospital, it was determined by a physician, since the September 2, 2018 attack and after Plaintiff's Twenty-five (25) day hospital stay, he continued to experience constant and consistent pain in his epididymis \ permanent and painful lumps of dead tissue on his testicle and pain during ejaculation.  Plaintiff expressed concern of testicular cancer to FCI Berlin prison authorities, whom promptly scheduled the latter out patient visit. As of today, he is awaiting a follow up sonogram to the right testicle, but, has been delayed since March of

2020, due to the COVID-19 pandemic.

83. All the Defendants conduct was so outrageously inhumane in character, and so extreme in degree, as to go beyond all possible bounds of decency and should be regarded as deliberated indifference, atrocious and utterly intolerable in a civilized community.

## FOURTH CAUSE OF ACTION
## Deliberate Indiffenece

FCI Loretto Prison Officials Failure to Provide Treatment
and Interference With Prescribed Treatment

84. Plaintiff  incorporates paragraphs 1 through 83 as though they were stated fully herein.

85. Defendants: Martynuska, McLoughlin, Murphy


### A. Deprivation of Basic Human Needs

86. Each of the Defendants acted with deliberate indifference to Plaintiff's Chronic epididymitis medical records vital for future care.

### B. Officials Knowledge of Need

87. Both by written and verbal communication, Plaintiff unequivocally requested to receive the previously prescribed antibiotic, specifically Docycycline or Ciprofloxacin.  These request would have occurred beginning July 12, 2018 until September 2, 2018.

### C. Officials Failure to Provide Treatment

88. All the above-listed Defendants intentionally ignored Plaintiff's request for the antibiotics previously prescribed by Dr. Thomas in 2013, during Plaintiff's visit to the local emergency room in Madera, California.

89. On September 2, 2018, Plaintiff had been temporarily returned to FCI Loretto after his initial visit to the Altoona Hospital emergency room. The emergency room physician, Dr. Shepherd had prescribed the antibiotic Levaquin and directly handed the tablets to C.O. Mc.Laughlin with instructions that it was imperative that Plaintiff take this antibiotic for ten (10) days. Plaintiff cautioned the doctor that prison policy may preclude him bringing antibiotics into the prison, in response, Mr. Laughlin was instructed to alert prison authorities to this directive and to call the hospital if there was a problem. At that time, the anitbiotics were handed to C.O. Murphy, instead of McLaughlin.

## D. Causation and Injury

90. Upon return to the prison, Martynuska interfered with the dispersing of the antibiotic Levaquin. At no time did either Murphy nor McLaughlin convey to Martynuska the directives given by Dr. Shephard. Martynuska stated Plaintiff was not permitted to have anitbiotic in his cell, stating it was a narcotic. Rather, John doe #1, a third shift C.O., was tasked to deliver Ibuprofen to Plaintiff throughout the third shift watch. This was contrary to policy and inadequate care.

91. The next day, on September 3, 2018, at approximately 12:10 a.m, as a result of, inter alia, a scrotal ultrasound which detected increased vascular flow in the right testicle and epididymis compatible with epididymo-orchitis, as determined by attending interpreter Stephen Ventreli, D.O, at the request of hospital officials Plaintiff was returned on September 3, 2018 and remained until September 27, 2018.

## FIFTH CAUSE OF ACTION


## Deliberate Indifference

Plaintiff was subjected to Cruel and Unusual Punishment in Violation of the

Eighth Amendment of the United States Constitution.

92. Plaintiff incorporates paragraphs 1 through 91 as though they were stated fully herein.

93. Defendants: Martynuska, Lt. Robinson, Weidlich, Swindell, Bradley, Moser, Golden, Bender, Mc.Laughlin, Miles, Wirfel

## A. Deprivation of Basic Human Needs

94. Each of the Defendants acted with deliberate indifference to Plaintiff's Chronic epididymitis medical records necessary for future care and prevention.

95. On September 2, 2018, Plaintiff, in the morning of the 52nd day of delay without adequate treatment, he began to go from sever septic shock to septic shock and he began to suffer severe abdominal and back pain conteporaneous to his already sever scrotal and testicle pain.  In the early afternoon, Plaintiff's cellmate noticed C.O. Salyards making SHU rounds and he requested that the medical department be summoned.

## B. Officials Knowledge Of Need

96. A short time later, Martynuska arrived at SHU cell #8, Plaintiff informed Martynuska that his pain was so bad that he could not even turn over in his bed, despite having taken about 8-10 Ibuprofen within the last two hours.  Martynuska summarily dismissed Plaintiff's complaints, stating she would check his medical records for his contention of chronic epididymitis and check back in the evening during pill line.

## C. Officials Failure to Provide Treatment

97. The actions and inactions of Martynuska and FCI Loretto Staff demonstrated deliberate indifference to Plaintiff's serious medical condition and a depraved heart to his excruciating pain and suffering.  Plaintiff was in his cell crying with pain. His back pain became so severe that he could not even get

out of bed, nor even stand up.  In fear that he was going to die, plaintiff had to cry out to his fellow SHU detainees to assist him by yelling for the SHU custodian, C.O. Salyards.  As a point for injunctive relief, FCI Loretto's SHU has no " emergency panic buttons, for cases such as here.  Eventually Martynuska arrived, she then called Lt. Robinson, the shift supervisor at that time, whom arrived with McLaughlin.

98. Plaintiff, though in excruciating pain, stated it was an emergency and he requested to be taken to the hospital.  Martynuska stated, "You weren't this sick this morning how did you get so sick so fast, you appeared fine this morning.' FCI Loretto Staff, specifically Martynuska and Lt. Robinson met Plaintiff;s cries of pain with callous indifference and direct accusations that he was "faking" and "lying."

99. Martynuska departed, leaving Lt. Robinson and Mc.Laughlin to extract Plaintiff from SHU cell #8. Plaintiff was unable to stand, yet, Lt. Robinson threatened to leave him there unless he stood and was handcuffed behind his back. Lt. Robinson became irritated and annoyed and again falsely accused Plaintiff of "faking it."  Plaintiff's cellmate had to be uncuffed to assist Plaintiff to stand and be cuffed in the back.  Plaintiff requested a wheelchair, but they denied him a wheelchair or any other such device.

### D. Causation and Injury

100. Following this time lengthy extraction, Plaintiff could not walk unassisted, even though Lt. Robinson had his arm on one side and McLaughlin on the other, they essentially drug him down the range.  As can be supported by the CCTV video footage, which Mr. Thomas requested be preserved in his Administrative Remedy submissions in this matter.  Until abut 3/4 of the corridor when Plaintiff fell to his knees in excruciating pain.  At that point, Martnuska, who had been watching while standing in the doorway, she did then physically lift Plaintiff's

ankles and the three staff members carried Mr. Thomas into the SHU medical room for examination.

101. FCI Loretto Staff's behavior, specifically Lt. Robinson and McLaughlin's actions of forcibly dragging Plaintiff down the SHU range, as Plaintiff screamed loudly in excruciating pain, so outraged Plaintiff's fellow SHU detainees that they screamed at Lt. Robison and McLaughlin, "stop treating him as if he were an animal!" In support of this fact, two such inmates provided affidavits to Mr. Thomas which detailed the events they witnessed herein. The screams were in vain and the torturous conduct continued in the SHU medical examination room and subsequently, after Mr. Thomas had been transported to the Health Services Department for the general population, while left alone with Lt. Robinson awaiting the arrival of an ambulance.

## SIXTH CAUSE OF ACTION

### Bivens Claim for Excessive Force and Brutality

Plaintiff was subjected to Cruel and Unusual Punishment in Violation of the Eighth Amendment of the United States Constitution.

102. Plaintiff incorporates paragraphs 1 through 101 as though they were stated fully herein.

103. Defendants: Martynuska, Lt. Robinson, Weidlich, Swindell, Bradley, Taggart, Moser, Golden, Bender, McLaughlin, Wirfel, Miles and Murphy.

A. Plaintiff was No Threat to the Safety to Staff and Inmates

104. Plaintiff, while still handcuffed behind his back, sitting in the SHU medical examination room, he was then placed in a wheelchair. Martynuska, Lt. Robinson, McLaughlin and Murphy brought him to the Health Services Department, normally accessible to inmates in general population, to await arrival of an ambulance which transported Plaintiff to the Altoona Hospital.

-30-

105. Preparatory to the hospital trip, C.O. Murphy and McLaughlin were assigned the tasked to escort him, which necessitated performance of safety protocol by them.  At that time, Martynuska likewise departed, which left Mr. Thomas in the exclusive custody of Lt. Robison.  It is telling, Lt. Robinson purposefully waited until he and Mr. Thomas were in a medical room with no camaras to prevent video support for the forthcoming assault and mistreatment of Mr. Thomas.  Lt. Robinson put his finger an inch away from Mr. Thomas' face and called him a "scumbag nigger drug dealer" and then verbally taunted him.  In response, Plaintiff screamed back at Lt. Robinson telling him to get his finger out of his face.  At not time did Plaintiff pose any threat to Lt. Robinson, wherein, he was physically limited in his movements by both the handcuffs and his debilitating physical condition.  Of more significance, Plaintiff was thankful for being taken to a hospital to receive treatment which had been delayed for Fifty-two (52) days.  Mr. Thomas was fearful of the fact, that at any time, prison officials could simple return him to his SHU cell.

106. Lt. Robinson then with malicious and sadistic intent, did use a clenched fist, and punched Mr. Thomas in the side of his head, the blow struck him on the left side of his head slightly behind his left ear.  Mr. Thomas' head was snapped sideways by the blow.

107. Lt. Robinson then threatened that when Plaintiff returned to general population, Lt. Robinson and his co-workers were going to physically beat him up. A yelling confrontation ensued, wherein, Lt. Robinson said, "Now go and file your administrative remedies on that."  Lt. Robinsonn made reference to, inter alia, Plaintiff's administrative remedy filed against C.O. Jozwiak ("Blue").  At that time, Martynuska returned and asked Lt. Robinson if she needed to call somebody for assistance.  In response, Lt. Robinson stated, "No, He didn't need any assistance."  Martynuska again departed.

## NO NEED FOR FORCE

108. Despite Plaintiff's obvious severe and debilitating medical condition requiring obvious medical attention, Lt. Robinson's intentional excessive use of force represented cruel, inhumane, malicious and sadistic behavior, said actions by Lt. Robinson represented calculated brutality and excessive use of force unrelated to any legitimate penalogical purpose. Plaintiff had done nothing wrong to warrant any force used against him.

109. Each of the Defendants violated Plaintiff's clearly established constitutional right to be free from excessive force and brutality during the course of his detention, by torturing, beating, retaliating, assaulting, abusing, treating sadistically, harassing, using excessive force, and physically injuring Plaintiff, physically, mentally and emotionally while he was already in severe pain and facing a life or death medical crisis.

110. Each of the Defendants acted with deliberate indifference to the rights, health, safety and welfare of the Plaintiff. Defendants Weidlich, Swindell, Bradley, Taggart, Moser, and FCI Loretto Administrators and Staff failed to properly supervise their subordinates in order to stop their use of excessive force and brutality. The Defendants knew of violations of Plaintiff's constitutional rights and refused to do anything to rectify the violations.

111. As a result, a direct and proximate cause of the Defendant's actions or inactions described herein, Plaintiff incurred tremendous pain and suffering, mental anguish and permanent damage to his epididymis and testicles.

## SEVENTH CAUSE OF ACTION

### Bivens Claim Retaliatory Treatment

Plaintiff was subjected to Retaliatory Treatment in Violation of the First Amendment of the United States Constitution

112. Plaintiff incorporates paragraphs 1 through 111 as though they were

stated fully therein.

113. Defendants: Martynuska, Lt. Robinson, Weidlich, Swindell, Bradley, Taggart, Moser, Golden, Bender, McLaughlin, Wirfel, Murphy, and Miles.

114. Almost immediately after Plaintiff was alone with Lt. Robinson, the Defendant repeatedly harassed Plaintiff for having filed grievances against, inter alia, C.O. Jozwiak and SIS Officers Yingling and Henry, even though Plaintiff had good reason to do so.

115. Lt. Robinson repeatedly told Plaintiff that he was faking it, and, that "he was the type who liked to file grievances against good white corrections officers, and it didn't matter because Plaintiff wasn't going to be getting any money and that nothing would be done."

116. After McLaughlin and Murphy returned to the medical room, Lt. Robinson ordered Murphy to remove Plaintiff's SHU issued sneakers and socks for the purpose of adding more suffering, torment and pain to Plaintiff upon his return to the prison from the hospital.

117. As to the claim at 116 while at the hospital, both Murphy and McLaughlin conceded, regarding the removal of Plaintiff's protective footwear, that was a first time that ever occurred in all the numerous medical trips they have taken. Neither man knew of any old or new prison regulation or directive which dictated any such action.

118. As a result, indeed, when Plaintiff was discharged from the Altoona Hospital later that same night [September 2, 2018], he had to walk nearly one hundred yards while barefoot and shackled over rough dirty concrete to reach the institution's vehicle. Ultimately however, Plaintiff was returned to the hospital hours later.

119. On September 27, 2018, Plaintiff, after his twenty-five day stay, was transported from the hospital to FCI Loretto. Weidlich elicited an unnecessary

threat, that, he desired to have twent-five days added back on to Plaintiff's sentence.

120. To add further to the perceived indecorum, owing to administrative remedy response and other evidence regarding this issue, Weidlich has fraudulently misrepresented facts which should have been answered by Martynuska, and he has sought to conceal the original record.

121. The medical record in this matter, currently in Plaintiff's possession, does not contain all the INMATE REQUEST TO STAFF, filed  Plaintiff, though Bender had previously conceded the request had been filed.  Further, Plaintiff's medical record contains false and misleading computer generated documents, as will be proven in discovery or at trial.

122. On October 17, 2018, A.W. Taggart while conducting SHU rounds, stopped at cell #10, as witnessed by Plaintiff's cellmate Eric Sharpe, Taggart issued retaliatory threats, harassed and taunted Plaintiff with statements volative of the Prison Rape elimination Act ("PREA") pursuant to BOP policy: LOR 5324.12 D, p.2, 4 PROCEDURES states, 1. The Associate Warden [in this case Taggart] has been designated as the PREA Compliance manager, whose duty consist of staff training. Taggart stated, "O Yeah, Thomas! [Plaintiff], the Altoona guy, your a liar, I watched the video tape [CCTV video of the September 2, 2018 extraction] you lied on my staff in your grievance!  But, I'm going to make sure we raise your custody points and find you guilty at your DHO hearing.  Then I will make sure you are sent to a medium security prison in Arizona, far away from your family, and I'll make sure you get your virginity taken, somebody will rape you!"

123. These acts represent a pattern of events demonstrating intentional retaliation against Plaintiff by Defendants for filing grievances which have caused Plaintiff further mental anguish as a result.

## VI.

### Prayer for Relief

124. WHEREFORE, Plaintiff respectfully prays that this Court:

A. Declare that the acts and omissions described herein violated Plaintiff's rights under the United States Constitution and law of the United States;

B. Order Defendants to pay reasonable attorney fees and cost;

C. Order Defendants to pay Compensatory damages, Punitive damages and Nominal damages;

D. Order injunctive relief (for permanent) pain relief and post-incarceration or future sicknesses and examinations to correct permanent damage to the epididymis and painful cyst on the testicles;

E. Grant other just and equitable relief that this Court deems necessary.

## VII.

### Relief

125. Plaintiff seeks the following:

A. Compensatory damages in the amount of $200,000.00, for pain and suffering for Fifty-two (52) days before receiving treatment;

B. Compensatory damages in the amount of $200,000.00, for the constant and consistent pain in the epididymis and cyst on the right testicle;

C. Compensatory damages in the amount of $200,000.00, for the intentional infliction of Emotional Distress;

D. Punitive damages in the amount of $400,000.00, as to Defendants: Bradley, Moser (or successor), Taggart, Weidlich and Swindell on the constituti-al claims;

E. Punitive damages in the amount of $175,000.00 each, as to Defendants: Martynuska, Lt. Robinson, Golden, Miles and Wirfel;

F. Order permanent injunctive relief for Plaintiff to receive proper post-incarceration pain medications and examinations to repair as much damage as

possible;

G. Any other further relief the Court deems appropriate.

126. Pursuant to Federal Rules of Civil Procedure 38(a) and (b). Plaintiff demands a jury trial.

127. Pursuant to 28 U.S.C. § 1746, I declare and verify under penalty of perjury and under the laws of the United States of America that the foregoing is true and correct. Executed on this 4th day of February, 2022

                                        Respectfully submitted,


                                        /s/ Victor D Thomas
                                        Victor Darnell Thomas
                                        In Propria persona
                                        Reg. No. 11021-068
                                        FCI Berlin
                                        P.O. Box 9000
                                        Berlin, NH 03570-9000