## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VICTOR DARNELL THOMAS, | ) | |
| | ) | CIVIL ACTION NO. 20-181J |
| Plaintiff, | ) | |
| | ) | JUDGE HAINES |
| | ) | MAGISTRATE JUDGE PESTO |
| v. | ) | |
| | ) | |
| R.N. MARTYNUSKA, | ) | |
| Medical Contractor, FCI Loretto, | ) | *(Electronically Filed)* |
| | ) | |
| M.D. KIM SWINDELL, | ) | |
| | ) | |
| LT. ROBINSON, | ) | |
| Shift Commander, FCI Loretto, | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS,
### OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

Defendants, R.N. Martynuska, Medical Contractor, FCI Loretto; M.D. Kim Swindell; and Lt. Robinson, Shift Commander, FCI Loretto, ("Defendants") by their attorneys, Eric Olshan, United States Attorney for the Western District of Pennsylvania, and Karen Gal-Or, Assistant U.S. Attorney for said district, hereby moves to dismiss Plaintiff Victor Darnell Thomas ("Plaintiff")'s Third Amended Complaint, with prejudice. As discussed in detail below, Plaintiff's claims are precluded by the Supreme Court's holdings in *Ziglar v. Abbasi,* 582 U.S. 120 (2017), and *Egbert v. Boule,* 596 U.S. 482 (2022). Further, Plaintiff has failed to plead facts that plausibly state a claim that the Defendants violated his constitutional rights and thus Defendants are entitled to qualified immunity on all claims.

## I.   FACTUAL & PROCEDURAL BACKGROUND

On February 11, 2022, Plaintiff filed his Third Amended Complaint against FCI Loretto and thirteen staff members, including medical staff and prison officials. Complaint, ¶¶ 5-16. On

June 7, 2022, this Honorable Court issued a Report and Recommendation, finding that Plaintiff "adequately stated a deliberate indifference claim under *Farmer v. Brennan*, 511 U.S. 825 837 (1994)" against Defendants Swindell, Martynuska, and Robinson, as well as Eighth Amendment and First Amendment retaliation claims against Defendant Robinson. Doc. 28 at 1-2. As the Third Amended Complaint had not yet been served on the Defendants, they were not afforded an opportunity to respond to the Complaint or to the Court's Report and Recommendation. On April 21, 2023, Judge Haines adopted the Report and Recommendation and dismissed Plaintiff's claims against the remaining ten defendants. Doc. 33.

### a. Allegations Related to Deliberate Indifference Claim

In the Third Amended Complaint, Plaintiff alleges that he was housed in the Special Housing Unit (SHU) at FCI Loretto in July 2018, and that on or about July 2, 2018, he began experiencing severe scrotal pain and swelling in his right testicle. Complaint, ¶ 29. Plaintiff alleges that he informed FCI Loretto medical staff of his pain and of a 2013 diagnosis of epididymitis. *Id.* In an Inmate Request to Staff dated July 18, 2018, he requested medical treatment for a "slight tingling or itching sensation at the end of urinating." *See* Exhibit A, Medical Records, p. 105.

Medical records show that, on or about July 19, 2018, Plaintiff was seen at the facility's Health Services Unit by Defendant Kim Swindell and Registered Nurse (RN) Justin Bender, who conducted a physical exam and urinalysis test, diagnosing Plaintiff with a urinary tract infection ("UTI"). *See* Exhibit A, pp. 49, 52-53, 81 (showing an abnormal urine culture); Complaint at ¶¶ 34(e), 35. Defendant Swindell prescribed Plaintiff medication to address his UTI. Exhibit A, p. 52; Complaint at ¶ 35. During a follow-up visit to Health Services that same day, Plaintiff reported no abdominal pain or fever. *See* Exhibit A, p. 49. Plaintiff reported that he "feels fine other than frequent urination" and that he had "no blood in urine." *Id.*

2

On August 5, 2018, Plaintiff was evaluated by RN Bender again for frequent and painful urination that "began" the night before and another urinalysis test was conducted. Exhibit A, pp. 44-45; Complaint at ¶ 38. Plaintiff reported his pain level as a 3 out of 10 and the urinalysis returned unremarkable. Exhibit A, p. 45. Plaintiff was told to alert the Health Services staff if symptoms continued so an additional urine culture could be obtained. Exhibit A, p. 45. Plaintiff alleges that Bender denied him antibiotics, and he "wrote to Defendant Swindell on no less than three (3) separate occasions [of experiencing pain] with negative response." Complaint at ¶ 58.

On or about September 2, 2018, Plaintiff was evaluated by Defendant Nicole Martynuska for right testicle and lower back pain and resultant difficulty ambulating. Exhibit A, pp. 34-43; Complaint at ¶ 40(c). Before being evaluated, Plaintiff had already been administered amoxicillin and acetaminophen. Exhibit A, p. 40; Complaint at ¶ 40(b). In his Complaint, Plaintiff alleges that he was denied a wheelchair and was dragged down the hallway to the SHU medical room. Complaint at ¶ 40(g), (h). Plaintiff's medical records show that he was transferred to Health Services by wheelchair and that "he needed 2 assisting people to transfer him to the table from the wheelchair." Exhibit A, p. 34. Plaintiff received 30 mg of Toradol and was transported to Health Services to await arrival of an ambulance to transport him to the hospital. Exhibit A, p. 35. That same day, Plaintiff was transported to UPMC Altoona for further evaluation. An ultrasound revealed right epididymitis and he was treated with antibiotics. Exhibit A, pp. 96-97. He was discharged the same day back to FCI Loretto, and prescribed Levofloxacin. Exhibit A, pp. 30-32.

Upon returning to FCI Loretto, Plaintiff alleges that Defendant Martynuska did not permit Plaintiff to take the medication to his cell because it was a narcotic. Complaint ¶ 90. On September 3, 2018, UPMC Altoona contacted FCI Loretto due to the blood culture growing gram-negative

bacilli and he was returned to UPMC Altoona for intravenous antibiotic treatment. Exhibit A, p. 24-25; Complaint ¶ 91.

On September 5, 2018, Plaintiff was transferred to Select Specialty Hospital in Johnstown, Pennsylvania due to security concerns. Exhibit A, pp. 22-23. On September 10, 2018, Kim Swindell visited Plaintiff at Select Specialty where he was being treated for epididymitis and gram-negative bacilli. Exhibit A, p. 21. Plaintiff was receiving medication and he reported that the pain and swelling of the groin/testicle had improved. *Id.*

On September 19, 2018, Plaintiff's intravenous antibiotic course was changed at the recommendation of a urologist. Exhibit A, pp. 9-14. On September 27, 2018, Plaintiff was discharged from Select Specialty Hospital and returned to FCI Loretto, where his antibiotic treatment continued. Exhibit A, pp. 1-6.

b. **Allegations Related to Eighth Amendment Excessive Force and First Amendment Retaliation Claims**

Plaintiff alleges that after he was brought to the SHU medical room on September 2, 2018, he was briefly left alone with Defendant Robinson. Complaint, ¶ 105. Plaintiff alleges that Robinson put his finger close to Plaintiff's face and called him a "scumbag nigger drug dealer." *Id.* Plaintiff further alleges that Robinson struck him on the side of his head with a closed fist. *Id.* at ¶ 107. Plaintiff alleges that he and Robinson began yelling at each other, with Robinson allegedly referencing an administrative claim that Plaintiff made against another correctional officer. *Id.* Robinson allegedly threatened Plaintiff with physical violence after he was returned to general population confinement. *Id.* Robinson allegedly told Plaintiff that he was faking his symptoms and that "he was the type who liked to file grievances against good white corrections officers" and "that nothing would be done." *Id.* at ¶ 115.

## II.  APPLICABLE LEGAL STANDARDS

*Pro se* pleadings – like Plaintiff's Complaint – are construed liberally and held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Still, a court need not accept legal conclusions disguised as statements of fact, unsupported conclusions, or unwarranted references. *See Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007); *Day v. Fed. Bureau of Prisons*, 233 F. App'x 132, 133 n. 2 (3d Cir. 2007). To the contrary, "a pro se complaint must still 'contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Wallace v. Fegan*, 455 F. App'x 137, 139 (3d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Thus, all litigants – regardless of their representation status – must comply with the applicable Federal Rules. *See Byrne v. Cleveland Clinic*, 684 F. Supp. 2d 641, 649 (E.D. Pa. 2010). Here, the Defendants move to dismiss Plaintiff's *pro se* Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) or, in the alternative, 56(a).

A Rule 12(b)(1) motion "challenges a court's subject matter jurisdiction over the plaintiff's claims" and "very power to hear the case." *McCluskey v. United States*, No. 10-694, 2010 WL 4024717, *3 (W.D. Pa. Oct. 12, 2010) (quotations and citations omitted). Such attacks can be either facial or factual; in the latter instance, "the court does not attach a presumption of truthfulness to the plaintiff's allegations, and the existence of disputed material facts does not preclude the court from deciding for itself the jurisdictional issues raised in the motion to dismiss." *Id*. at *8. When presented with a factual attack, the court "must weigh the evidence relating to jurisdiction," and may "consider affidavits, documents, and even limited evidentiary hearings to make the jurisdictional determination." *Id*. (citing *Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007)). Here, Defendants levy a factual attack to Plaintiff's Complaint. Plaintiff bears the

burden of rebutting that attack and demonstrating the existence of subject matter jurisdiction. *See Dev. Fin. Corp. v. Alpha Housing & Health Care*, 54 F.3d 156, 158 (3d Cir. 1995); *Degenes v. Murphy*, No. 07-1370, 2008 WL 450426, *2 (W.D. Pa. Feb. 15, 2008).

A Rule 12(b)(6) motion questions whether the plaintiff presents a plausible claim for relief. *See* Fed. R. Civ. P. 12(b)(6). In ruling upon such a motion, a court must accept all well-pled facts as true, disregard any legal conclusions, and determine whether the complaint includes "sufficient factual matter" to create a "'reasonable inference that the defendant is liable for the misconduct alleged.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 663); *see also Day*, 233 F. App'x at 133 n. 2. The court may also consider "matters of public record and other matters of which a court may take judicial notice … exhibits attached to the complaint … [and] indisputably authentic documents." *Whiteford v. Pennsylvania*, No. 12-55, 2012 WL 4076190, *6 (W.D. Pa. Aug. 13, 2012).

Finally, a court may convert a Rule 12(b)(6) motion into a Rule 56(a) motion for summary judgment, provided the respondent receives notice and an opportunity to present rebuttal material to the court. *See Latham v. United States*, 306 F. App'x 716, 718-19 (3d Cir. 2008); *Harris v. Fed. Bureau of Prisons*, No. 16-235, 2018 WL 8895810, *1, 4-5 (W.D. Pa. Aug. 10, 2018) (recommending summary judgment where motion to dismiss attached materials outside the pleadings). Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). That is, Rule 56(a) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The plaintiff cannot merely rest on allegations in his complaint. *See id*. at 324. To defeat a motion

for summary judgment, "the nonmoving party must adduce more than a mere scintilla of evidence in his favor." *Williams v. Borough of Chester*, 891 F.2d 458, 460 (3d Cir. 1989). Here, Plaintiff cannot do that, and his claims against Defendants must be dismissed.

## III. ARGUMENT

### a. Plaintiff Fails to Plead a Cognizable *Bivens* Claim.

For the reasons set forth below, Supreme Court precedent forecloses Plaintiff's *Bivens* claims.

### i. Creation of the *Bivens* claim and modern narrowing of the remedy.

In *Ziglar*, the Supreme Court summarized the creation of the *Bivens* remedy and the Court's subsequent retreat from the now disfavored remedy. In 1871, Congress passed a Civil Rights Act, later codified at 42 U.S.C. § 1983, which created a private right of action for "money damages if a state official violates [a person's] constitutional rights." *Ziglar,* 582 U.S. at 130. "Congress did not create an analogous statute for federal officials." *Id*. Approximately 100 years later, the Supreme Court decided *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), and "under general principles of federal jurisdiction," authorized an implied cause of action and remedy for violations of the Fourth Amendment by federal officers. *Id*. Over the following decade, the Supreme Court recognized an implied *Bivens* claim in only two other narrow contexts. *See Davis v. Passman*, 442 U.S. 228 (1979) (recognizing Fifth Amendment claim by an administrative assistant against a Congressman for firing her because she was a woman); *Carlson v. Green*, 446 U.S. 14 (1980) (recognizing an Eighth Amendment claim where jailers failed to treat a prisoner's immediately life-threatening asthma attack, resulting in his death).

"After those decisions, however, the Court changed course." *Hernandez v. Mesa*, 140 S. Ct. 735, 741 (2020). Since *Carlson*, the Court has consistently declined – in twelve cases now – to

recognize an implied damages remedy under the Constitution, *Egbert*, 596 U.S. at 486 (collecting cases), and instead has noted that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar*, 582 U.S. at 135; *see also Mammana v. Barben,* 856 F. App'x 411, 413 (briefly describing the creation, expansion, and restriction of *Bivens*); *Mack v. Yost*, 968 F.3d 311, 318-19 (3d Cir. 2020) (finding that *Ziglar* "changed the landscape" for how the Third Circuit approaches *Bivens* claims). This is because the *Bivens* trilogy of cases were decided during an "ancient regime" when "the Court assumed it to be a proper judicial function to 'provide such remedies as are necessary to make effective' a statute's purpose." *Ziglar*, 582 U.S. at 131–32 (citations omitted). The Court has now "come 'to appreciate more fully the tension between' judicially created causes of action and 'the Constitution's separation of legislative and judicial power.'" *Egbert*, 596 U.S. at 491 (quoting *Hernandez*, 140 S. Ct. at 741). In *Ziglar*, the Supreme Court outlined a two-part test for courts to use in deciding whether to imply a *Bivens* remedy. First, the Court asks: "whether the case presents 'a new *Bivens* context'—*i.e.*, is it 'meaningful[ly]' different from the three cases in which the Court has implied a damages action." *Egbert*, 596 U.S. at 492 (quoting *Ziglar*, 592 U.S. at 139). "Second, if a claim arises in a new context, a *Bivens* remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Id*. (quoting *Ziglar*, 582 U.S. at 136).

In 2022, the Supreme Court further refined the proper *Bivens* framework and, in doing so, declined to recognize a *Bivens* claim in "almost parallel circumstances" as those present in *Bivens*. *See Egbert*, 596 U.S. at 495. The Court explained that "in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the Courts." *Id*. at 486. *Egbert* made clear that "[b]ecause recognizing a *Bivens* cause of action is an *extraordinary* act that places great stress

on the separation of powers, [the Court has] a concomitant responsibility to evaluate *any* grounds that counsel against *Bivens* relief." *Id.* at 498, n.3 (cleaned up) (emphases added). Further, because even "potential special factors that previous *Bivens* cases did not consider" make a case a "new" context under the first prong, the two-part *Bivens* analysis "often resolve[s] to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* at 492–93 (noting the Court has "identified several examples of new contexts," including "potential special factors that previous *Bivens* cases did not consider, . . . largely because they represent situations in which a court is not *undoubtedly* better positioned than Congress to create a damages action"). In addition, the *Egbert* majority recognized that *Bivens*, *Davis*, and *Carlson* "predate[] [the Court's] current approach to implied causes of action" and therefore should carry "little weight." *Id.* at 500; *see also id.* at 495 (noting that *Bivens* itself "never meaningfully undertook" a special factors analysis). In other word, "[e]ven assuming the factual parallels are a close" as a plaintiff claims they are to *Carlson* (or *Davis* or *Bivens*), "a plaintiff cannot justify a *Bivens* extension based on 'parallel circumstances'" with those cases unless he also satisfies the 'analytic framework' prescribed by the last four decades of intervening case law." *Id.* at 501.

Collectively, these principles impart that courts must *always* analyze whether a *Bivens* claim should be allowed to proceed and that analysis must *always* consider special factors and separation of powers. *See id.* at 493 ("We have never offered an 'exhaustive' accounting of such scenarios [that make a context new], however, because no court could forecast every factor that might 'counsel hesitation.'" (quoting *Ziglar*, 582 U.S. at 139)). In other words, a court now "faces only one question: whether there is *any* rational reason (even one) to think that Congress is better suited to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Id.* at 496 (quoting *Abbasi*, 582 U.S. at 136); *id.* at 493 ("[T]he court must ask *only* whether it, rather than

the political branches, is better equipped to decide . . . ."). The two-step "new context" and "special factors inquiries only serve to "inform a court's analysis" of this single question. *See id.* at 492.

Here, whether this Court analyzes Plaintiff's claim under the two-step approach or simply asks the essential question from *Egbert* of "whether there is any reason to think that Congress might be better equipped to create a damages remedy," dismissal is warranted. *See id.* at 492 (noting that under the Court's framework a *Bivens* remedy will be unavailable "in most every case"); *accord Crisantos v. Sims*, No. 21-cv-39, 2023 WL 3115686, at **3–4 (N.D.W. Va. Feb. 27, 2023) (noting *Egbert* "left unanswered . . . whether the 'single question' test removes the issue of whether [a] cause of action is a new context," and opining that "whether a new context or not" plaintiff had no *Bivens* remedy); *Kaneakua v. Derr*, No. 22-cv-00201, 2023 WL 2539952, at *4 n.8 (D. Haw. Mar. 16, 2023) ("Numerous courts similarly understand *Egbert* as having worked drastic changes to [*Abbasi*'s] framework by reducing the analysis to a single question." (citing cases)); *accord Silva v. United States*, 45 F.4th 1134, 1139–41 & n.4 (10th Cir. 2022) (declining to address "tension between *Egbert*" and the Court's two-step framework "because it is not necessary to dispose of the appeal before us," but noting *Egbert*'s "lessons" include that expanding a *Bivens* remedy "is impermissible in virtually all circumstances"). Indeed, *Egbert* affirmatively "indicated that" if the Court "were called to decide *Bivens* today, we so would decline to discover *any* implied causes of action in the Constitution." 596 U.S. at 502 (emphasis added).

### ii.   There is no *Bivens* First Amendment retaliation claim.

In *Egbert*, the Court held "*that there is no Bivens action for First Amendment retaliation.*" 596 U.S. at 498-499 (emphasis added). The Court found that the cost of extending *Bivens* to First Amendment retaliation claims "would pose an acute" problem of increasing the risk "that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of

their duties." *Id.* at 484 (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). And even before *Egbert*, the Third Circuit agreed. *See Mack*, 968 F.3d at 316 ("guided by [*Ziglar*], we have declined to recognize an implied remedy for First Amendment retaliation claims") *see also Bistrian v. Levi*, 912 F.3d 79, 95 (3d Cir. 2018) ("the Supreme Court has never recognized a *Bivens* remedy under the First Amendment."). Because the Court has declined to extend *Bivens* to First Amendment retaliation claims, Plaintiff's First Amendment retaliation claim against Defendant Robinson must be dismissed.

### iii. Plaintiff's excessive force allegations also present a new context, for which a *Bivens* remedy is unavailable.

As virtually every circuit to address the issue since *Egbert* has held, Plaintiff's excessive force claim against Defendant Robinson is also a "new context" from *Bivens, Davis,* or *Carlson*, for which no *Bivens* remedy exists. *See Alsop v. Fed. Bureau of Prisons*, No. 22-1933, 2022 WL 16734497, at *3 (3d Cir. Nov. 7, 2022) (holding excessive force claims "not a basis for relief under *Bivens*"); *see also Silva v. United States*, 45 F.4th 1134, 1137 (10th Cir. 2022) (declining a *Bivens* remedy for inmate's excessive force claim and noting BOP's administrative remedy program alone counselled against a remedy); *Chambers v. Herrera*, 78 F4th 1100, 1107–08 (9th Cir. Aug. 15, 2023) (holding same for inmate's excessive force claims arising from being sprayed in the face with mace and assaulted by prison guard, causing a broken wrist); *Patton v. Blackburn*, No. 21-5995, 2023 U.S. App. LEXIS 10715, at *7 (6th Cir. May 2023) (holding same for claims against prison guards who slammed a prisoner to the floor and bent his wrist back while in four-point restraints); *Greene v. United States*, No. 21-5398, 2022 WL 13638916, *4 (6th Cir. Sept. 13, 2022) (unreported) (holding "Eighth Amendment claims against federal corrections officers and officials for . . . excessive force, sexual harassment, sexual assault, and failure to protect arise in 'a new context'"); *Watkins v. Martinez*, No. 20-40781, 2022 WL 278376, at *1 (5th Cir. Jan. 31, 2022)

(same); *Watkins v. Carter*, No. 20-40234, 2021 WL 4533206, at *2 (5th Cir. Oct. 4, 2021) (same for claims arising from inmate being tackled and kicked to the ground).

District courts in this circuit and across the country agree. *See Challenger v. Bassolino,* No. 18-cv-15240, 2023 WL 4287204, *6 (D.N.J. June 30, 2023) (finding "excessive force claims . . . present a new context, and that 'special factors' counsel against expanding the *Bivens* remedy"); *Perry v. Do*e, No. 23-cv-00848, 2023 WL 4238487, *4 (M.D. Pa. June 28, 2023) ("Although *Bivens* itself concerned an excessive use of force claim, that claim was asserted under the Fourth Amendment and not the Eighth Amendment. . . . Thus, while Plaintiff's case arguably shares broad similarities with *Bivens* and *Carlson*, such broad similarities will be insufficient to support the Court extending Bivens to this new context."); *Scott v. United States*, No. 4:22-cv-0006, 2023 WL 4675976, *14 (M.D. Pa. Mar. 17, 2023), *R. & R. adopted in part*, 2023 WL 4673271 (M.D. Pa. July 20, 2023) ("The facts of this case surrounding Plaintiff's excessive force claim do not involve the Fourth Amendment . . . . The plaintiff in *Bivens* was not a prisoner at the time of the alleged use of excessive force whereas our Plaintiff is. All that is shared between the two cases is the allegation of excessive force. This is not enough."); *accord Egbert*, 596 U.S. at 495 ("While *Bivens* and this case do involve similar allegations of excessive force and thus arguably present 'almost parallel circumstances' or a similar 'mechanism of injury,' these *superficial similarities* are not enough to support the judicial creation of a cause of action." (emphasis added) (citation omitted)).

Specifically, although *Bivens* concerned an excessive use of force claim, that claim was asserted under the Fourth and not the Eighth Amendment, and thus the "constitutional right at issue" is different. *Ziglar*, 582 U.S. at 140. Moreover, while *Carlson* involved an Eighth Amendment claim, that claim was for deliberate indifference to an immediately life-threatening medical condition that resulted in death, not one for excessive force. As such, excessive force

claims present a different "judicial guidance as to how an officer should respond to the problem or emergency to be confronted," and a different "risk of disruptive intrusion by the Judiciary into the functioning of other branches[.]" *Id.* Plaintiff's excessive force claim is a new context, and many special factors (discussed below) counsel against a *Bivens* extension.

iv.    **Plaintiff's deliberate indifference to medical care claims present a new context and thus falls outside the *Bivens* framework.**

Plaintiff's deliberate indifference claim against Defendants Swindell, Martynuska, and Robinson also presents a new context for which a *Bivens* remedy is unavailable. At the outset, there is at least some question as to whether—under *Egbert*—this court even needs to evaluate "new context" for this claim. Indeed, the Tenth Circuit skirted the question of whether an inmate's dental care claim was "meaningfully different from *Carlson*, because in the wake of *Egbert*," BOP's Administrative Remedy Program (ARP) was "sufficient to foreclose a *Bivens* claim despite any factual similarity between the two." *Noe v. United States*, No. 23-1025, 2023 WL 8868491, at *3 & n.3 (10th Cir. Dec. 22, 2023) (declining a *Bivens* remedy for prisoner's claim against dental providers and a nurse who failed to give pain medicine for, and used fillings instead of crowns to treat, "substantial" pain in three teeth, resulting in an eighteen-month delay in treatment and tooth extraction). No longer is the *Bivens* inquiry "based on 'parallel circumstances' with . . . *Carlson*," which "predates [the] current approach to implied causes of action" and "carries little weight." *Egbert*, 596 U.S. at 501 (citing *Carlson*, 446 U.S. at 18–19). "Now," courts must always ask if "'there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy' at all." *Id.* And under *Egbert*, any factual similarity between *Carlson* and this case does not "bear on the relevant point": that the "Judiciary is comparatively ill suited to decide whether a damages remedy . . . is appropriate," even in cases involving "similar allegations of" deliberate indifference to medical care that "present 'almost parallel circumstances' or a similar 'mechanism

13

of injury'" to *Carlson*, because such "superficial similarities are not enough to support the judicial creation of a cause of action." 596 U.S. at 495.

In any event, even if this court deployed the two-step "new context" and "special factors" analysis for Plaintiff's claim, this case would still be a new context from *Carlson*. As noted, the Supreme Court has set a very low threshold for determining if a case presents a new *Bivens* context: "[i]f the case is different in *a* meaningful way" – i.e., just *one* way – from previous *Bivens* cases decided by this Court, then the context is new." *Ziglar*, 582 U.S. at 139; *Oliva v. Nivar*, 973 F.3d 438, 442 (5th Cir. 2020) (noting "[v]irtually everything else" outside the specific facts of *Bivens*, *Davis*, and *Carlson* is a new context). New context is a "broad" inquiry. *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020). It is undertaken in light of the Supreme Court's "expressed caution about extending" *Bivens*. *Ziglar*, 582 U.S. at 149. And it should be informed by the Supreme Court's "indicat[ion]" that, if called to decide *Carlson* today, it "would decline to discover *any* implied causes of action in the Constitution." *Egbert*, 596 U.S. at 502. Thus, even if differences between a case and *Carlson* are "perhaps small, at least in practical terms," the inquiry is "easily satisfied." *Id.* at 147–49 ("[E]ven a modest extension is still an extension. And this case does seek to extend *Carlson* to a new context[] . . . [partly due to] potential special factors that were not considered in previous *Bivens* cases."). Under *Egbert*, differences between this case and *Carlson* are meaningful if they are *either* among the seven in *Ziglar*'s non-exhaustive list *or* they "might" implicate separation-of-powers concerns or alternative remedial structures. *Egbert*, 596 U.S. at 493. So even if this Court finds that this case holds some similarity to *Carlson*, it is still a new context so long as any one of the factual or legal differences above are "meaningful."

Here, Plaintiff's deliberate indifference claim presents a new context because it diverges factually from *Carlson* and because it raises potential special factors and alternative remedial processes that *Carlson* did not consider, and which implicate separation-of-powers concerns (Plaintiff's claims clearly bear no resemblance to *Bivens* or *Davis*).[1] *See Tate v. Harmon*, 54 F.4th 839, 846 (4th Cir. 2022) ("The Supreme Court has instructed . . . that a new context may arise if even one distinguishing fact has the *potential* to implicate separation-of-powers considerations.").

### 1.   *This Case Presents a New Context Because It Diverges Factually from Carlson.*

The facts here differ meaningfully from *Carlson*. In *Carlson*,[2] the mother of a deceased prisoner brought an action against federal officials after the prisoner, Joseph Jones, died from prison officials' alleged conduct. There, Jones had previously been diagnosed as and was known to be a chronic asthmatic. *Id.* at 671. Shortly before the events giving rise to his death, Jones' "asthmatic condition required hospitalization for eight days." *Id*. After returning from the outside hospital, Jones "was not given proper medication and did not receive the steroid treatments ordered by" the hospital physician. *Id*. Shortly after, Jones was admitted to the prison infirmary and was suffering an asthmatic attack. *Id.* "Although he was in serious condition for some eight hours, no doctor saw him because none was on duty and none was called in." *Id*. An "unlicensed" nurse did

---

[1] Although the Court found in its screening of this matter that Plaintiff's claim can proceed under *Farmer v. Brennan*, 511 U.S. 825 (1994), the facts here are plainly distinguishable from those in *Farmer*. In *Farmer*, the Court held that prison officials may be held liable under the Eighth Amendment for the failure to protect the plaintiff's safety. 511 U.S. at 847. The plaintiff in *Farmer* alleged a violation of the Eighth Amendment based on allegations that the defendants had placed the plaintiff in the general population despite knowledge that she, as a transgender woman, would be particularly vulnerable to sexual attack by some inmates. *Id.* at 830–31. Unlike the plaintiff in *Farmer*, Plaintiff is not alleging that prison officials failed to protect him from other inmates but rather that he did not receive immediate medical care for epididymitis.

[2] The Supreme Court's decision in *Carlson* did not provide a detailed recitation of the allegations giving rise to Plaintiff's claims. 446 U.S. at 16 & n.1 Thus, this memorandum cites to the Seventh Circuit's decision in *Green v. Carlson*, 581 F.2d 669 (7th Cir. 1978).

not call a doctor, attempted to use equipment he had affirmatively been told was broken, and when Jones said the equipment made his breathing worse, the nurse administered injections of a drug contraindicated for a person suffering an asthmatic attack. *Id*. Thirty minutes after the injection, Jones went into respiratory arrest and the nurse and an officer then attempted to use emergency equipment that neither knew how to operate. *Id*. Jones was not taken to a hospital for some eight hours, and was pronounced dead upon arrival. *Id*.

After *Egbert*, "decisions involving medical care . . . have interpreted meaningful difference from *Carlson* in varying ways." *Qazi v. Seroski*, No. 22-cv-00014, 2023 WL 3871969, at *5 (D. Colo. May 11, 2023), *R. & R. adopted*, 2023 WL 3866406 (D. Colo. June 7, 2023). Most courts compare an inmate's factual allegations, including the nature and severity of the medical condition, "specifically against those in *Carlson*." *See id.* (collecting cases and finding this "latter, nuanced approach particularly persuasive as it is consistent with" *Ziglar* and *Egbert*). As several circuits have now said, "is not enough . . . that a case involves the same constitutional provision or the same right as in *Carlson*; that level of generality is too high." *Nellson v. Doe*, No. 21-6206, 2023 WL 3336689, at *4 (4th Cir. May 10, 2023) ("Even claims alleging deliberate indifference to an inmate's medical needs, though they 'involve the same right and mechanism of injury as in *Carlson*,' may 'still present different contexts.'" (quoting *Ziglar*, 582 U.S. at 139)); *Chambers*, 78 F.4th at 1108 (remanding inmate's medical care claim arising from a six-week delay in x-raying broken bones and instructing district court to "still assess the viability of the new claim under *Egbert*" because, while "[t]he claim would be the same constitutional right [as] in *Carlson*[,]" "other *Egbert* factors would need to be addressed to determine [if] this claim arises in a different context"). In fact, like Plaintiff's claim here about not being given a wheelchair (which medical records dispute), the Fourth Circuit in *Nellson* declined a *Bivens* remedy against corrections staff

arising from a mobility-limited prisoner being placed in a cell without a wheelchair, causing sores and a spinal injury to the inmate when he had to crawl around. *Nellson*, 2023 WL 3336689, at *4.

Here, Plaintiff's claim involving his months-long treatment for epididymitis and gram-negative bacilli, and the harm he allegedly suffered, are a far different context from the emergency life-threatening situation that prison officials in *Carlson* faced, and which proved fatal. These differences are meaningful under *Ziglar* and *Egbert* for several reasons.

First, non-emergency medical care for conditions that are chronic or not immediately life-threatening, like at issue here, carry a far greater "risk of disruptive intrusion by the Judiciary into the functioning of" the Executive Branch, *Ziglar*, 582 U.S. at 140, which operates federal prisons. *Watanabe v. Derr*, No. 22-cv-00168, 2023 WL 2500933, at *6 (D. Haw. Mar. 10, 2023) (collecting cases finding that nature/severity of a medical condition is a meaningful difference); *Thomas v. Carmichael*, No. 21-cv-00160, 2023 WL 5116599, at *10 (S.D. Ind. July 24, 2023) ("[T]his case does not involve responses to emergency medical situations, which might alter the policy balance that led the *Carlson* Court to justify a *Bivens* remedy because non-emergency situations are presumably more common.").[3] *Carlson* focused on an incidence of gross medical incompetence that proved fatal. In contrast the *Bivens* claim here turns on allegations of allegedly inadequate treatment of a non-fatal condition – epididymitis – over a course of months. *Carlson* never had to consider aspects of this case – like introducing narcotics in the prison setting – that at least have

---

[3] *See also Qazi*, 2023 WL 3871969, *6 (collecting cases and holding that failure to treat a "chronic but not life-threatening" condition is meaningfully different from the claim in *Carlson*); *Sloan v. Ratliff*, No. 21-cv-2663, 2022 WL 18814742, *4 (N.D. Tex. Dec. 4, 2022) (finding prisoner's claims arising from alleged denial of care for PTSD, long COVID symptoms, and neck, back, and right hip pain "differ in both 'type and severity' from *Carlson*"), R.&R. adopted, 2023 WL 2144156 (N.D. Tex. Feb. 21, 2023); *Washington v. Bureau of Prisons*, 16-cv-3913, 2022 WL 3701577 (D.S.C. Aug. 26, 2022); *Martinez v. U.S. Bureau of Prisons*, 5:15-cv-02160, 2019 WL 5432052, *8 (C.D. Cal. Aug. 20, 2019) (finding failure to provide adequate medical care claim "different in kind and severity").

the "potential" to impact separation-of-powers concerns. Such factual differences may have changed *Carlson*'s calculus in creating a remedy – or more to *Egbert*'s point, provide a rational reason to think that Congress is better suited to do so. This is especially true when the injuries that Plaintiff suffered (swelling of his groin/testicles over a course of months), are far more common than the emergency, life-threatening situation that justified a remedy in *Carlson*. *Egbert*, 596 U.S. at 500 (noting "common" claims are "more likely to impose 'a significant expansion of Government liability'" and "counsel[] against permitting *Bivens* relief" (quoting *F.D.I.C. v. Meyer*, 510 U.S. 471, 486 (1994)). To expand *Carlson* to a new context of cases with less serious injuries – and ones susceptible to remedies short of a judicially created damages action that has never been Congressionally authorized – risks "transforming [the court] into an *ad hoc* medical review board tasked with deciding, with little to no judicial guidance, which medical errors . . . cross the threshold into constitutional injury." *Washington v. BOP*, No. 16-cv-3913, 2022 WL 3701577, at *5 (D.S.C. Aug. 26, 2022). In sum, in contrast to *Carlson*, Plaintiff's claims implicate "a broad class of inmates suffering ill-defined injuries with ill-defined damages." *Tate*, 54 F.4th at 847.

Second, the "extent of judicial guidance as to how an officer should respond" here is far different from the medical "emergency" officials faced in *Carlson*. *Ziglar*, 582 U.S. at 140. This difference is akin to "a qualified-immunity defense." *Id.* at 177 (Breyer, J., dissenting). And while *Ziglar*'s dissent felt this consideration should not bear on a case's "context" or the availability of a remedy (but went to a claim's underlying merit), *see id.*, the plurality said it does. *Id.* at 148 (finding new context partly because judicial guidance was less "developed"). As discussed more below, for qualified immunity, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015); *accord Ziglar*, 582 U.S. at 140 (holding "generality of specificity of the official action" can make a context

18

new). Thus, differences from *Carlson* in how Defendants responded to and treated Plaintiff's conditions over the course of months – by, for instance, conducting a physical exam, a urinalysis and urine culture, being prescribed amoxicillin and acetaminophen, being transported to the hospital, where prison officials visited him and an ultrasound and blood culture were performed and he was treated with intravenous antibiotics – are meaningful. Indeed, unlike in *Carlson*, Plaintiff does not allege that he had been prescribed medication that BOP personnel failed to provide, nor that any medical professional had recommended a course of action to treat him that BOP personnel failed to follow. The closest he comes is Martynuska's alleged refusal to allow him to bring the medication prescribed by UPMC Altoona on September 2 to his SHU cell – not that she withheld his medication. Additionally, unlike in *Carlson*, Plaintiff alleges that the Defendants diagnosed and treated him for a different medical issue – a UTI – which presents with extremely similar symptoms as epididymitis, potentially making it harder for them to diagnose the epididymitis. The point is: the extent of judicial guidance for Plaintiff's claim is far different than *Carlson* and involves a court delving into intricacies of prison administration as to where medicine can be given, and how to treat a condition where the required response is far less obvious. *See Simpson v. Horning*, No. 20-3358, 2021 WL 5832282, at *2 (3d Cir. Dec. 9, 2021) ("[U]nlike the *Carlson* plaintiff, Simpson alleges he was provided treatment for his anxiety . . . .").

It is not enough that Plaintiff's claim and *Carlson* involve a similar standard of "deliberate indifference to . . . medical needs." *Ziglar*, 582 U.S. at 148. That is too high a level of generality to view the "broad" new context inquiry. *Hernandez*, 140 S. Ct. at 743; *Mullenix*, 136 S. Ct. at 308 (reminding courts "not to define clearly established law at a high level of generality"). Indeed, *Ziglar* held a detainee's abuse claim was a new context from *Carlson*, even if the parties agreed, and the court assumed, a similar a deliberate indifference "standard" applied. *Ziglar*, 582 U.S. at

146–48. Here, judicial guidance governing non-emergency medical care for a medical condition that did not prove fatal or was immediately life-threatening is far "less clear," *Ziglar*, 582 U.S. at 148, than *Carlson*'s context, where it should have been "obvious" how officials should respond. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (noting qualified immunity is overcome if it is "obvious" that specific conduct violates the Constitution); *Bulger v. Hurwitz*, 62 F.4th 127, 138 (4th Cir. 2023) ("[E]ven if Appellant could make out a claim for . . . failure to provide constitutionally adequate medical treatment, a lack of competent medical care did not cause Bulger's death.").

In sum, Plaintiff allegedly suffered from non-immediately life-threatening ailments and implying a remedy in this new context presents a far different risk of disruptive intrusion by the judiciary into prison administration. *Sargeant v. Barfield*, No. 21-2287, --- F.4th ---, 2023 WL 8224194, at *4 (7th Cir. Nov. 28, 2023) (noting consideration of the "risk of disruptive intrusion" in *Ziglar*'s new context analysis is "similar to" special factors inquiry). And, the extent of legal guidance as to how an officers in Defendants' shoes should respond was very different from the medical emergency an unlicensed nurse faced in *Carlson*. *See Turner v. Safley*, 482 U.S. 78, 85 (1987) ("Prison administration . . . has been committed to the responsibility of [the Legislative and Executive] branches, and separation of powers concerns counsel a policy of judicial restraint.").

### 2. *This Case Presents "Potential" Special Factors Carlson Did Not Consider.*

Third, there are meaningful *legal* differences between this case and *Carlson*: the potential special factors *Carlson* did not consider. *Cf. Snowden v. Henning*, 72 F.4th 237, 244 (7th Cir. 2023) ("If a case involves facts or legal issues that would require reweighing the costs and benefits of a damages remedy . . . then the difference is 'meaningful' . . . ."). The Supreme Court has repeatedly said (and held) that the presence of "potential" special factors not considered make a context new. *Egbert*, 596 U.S. at 492 (quoting *Ziglar*, 582 U.S. at 140); *Ziglar*, 582 U.S. at 148–

49 (holding Congressional action and inaction since *Carlson* in the form of the Prison Litigation Reform Act (PLRA) and the availability of alternative remedies are "features . . . not considered in the Court's previous *Bivens* cases"). Indeed, for these reasons the new context and special factors inquires "often" resolve to one question. *Egbert*, 596 U.S. at 492.

*Carlson* never considered at least two potential special factors: (1) Congress' action and inaction, through legislation like the PLRA, which "does not provide for a standalone damages remedy against federal jailers" and "suggests Congress chose not to extend . . . *Carlson* . . . to cases involving other types of prisoner mistreatment"—namely, here, cases involving non-emergency medical care for non-life-threatening conditions, *Ziglar*, 582 U.S. at 149; and (2) other alternative existing remedies, authorized by Congress, such as a judicial action for injunctive or other relief, BOP's ARP, and a complaint to—and potential investigation by—BOP Office of Internal Affairs (OIA) or the Department of Justice's Office of Inspector General (OIG). *See Hower v. Damron*, No. 21-5996, 2022 WL 16578864, at *3 (6th Cir. Aug. 31, 2022) (noting even if BOP's ARP "is not enough to deter . . . misconduct, 'the threat of an investigation through [OIA] or [DOJ-OIG] may also serve to deter misconduct.'").

Recognizing these arguments, numerous district courts have found prisoner medical care claims can present new contexts based on potential special factors *Carlson* did not consider. *E.g.*, *Debenedetto v Salas*, 2023 WL 6388127, at **7 & n.5 (N.D. Ill. Sept. 29, 2023) (finding inmate's claims related to mental health deterioration and broken toe arose in new context partly because *Carlson* did not consider the existence of alternative remedies or the absence of a standalone damages remedy in the PLRA); *Anderson v. Ruda*, 2023 WL 4188213, at *6 (C.D. Cal. Apr. 3, 2023) (finding the "existence of" BOP's ARP was a "factor . . . not considered . . . in *Carlson*"), *R. & R. adopted*, 2023 WL 4181258 (C.D. Cal. June 26, 2023); *Norton v. Kwon*, No. 22-cv-00109,

21

2023 WL 3042281, at *6 (D. Haw. Apr. 21, 2023) ("Because [BOP's ARP] was not considered by the Court in *Carlson*, this is another reason that Norton's claims arise in a new context."); *Stine v. Merrell*, No. 21-cv-00422, 2023 WL 3190798, at *4 (D. Ariz. Apr. 28, 2023) ("Neither of these special factors were considered in *Carlson* . . . [so] this case arises in a 'new context.'").

In fact, it is the availability of alternative remedies that are part of what make the factual differences here meaningful. The availability of alternative relief has been a chief separation of power concern since the creation of the *Bivens* remedy and, under the Supreme Court's current approach, it is one of the primary reasons to decline a *Bivens* remedy. *See Ziglar*, 582 U.S. at 140 ("It is of central importance, too, that this is not a case like *Bivens* or *Davis* in which 'it is damages or nothing.'"). The Court's decision in *Corr. Servs. Corp. v. Malesko*, illustrates the point. There, the Court found a federal prisoner's deliberate indifference to medical care claim "fundamentally different from anything recognized in" *Carlson* since the Court "consistently rejected invitations" to extend *Bivens* where a plaintiff did not "lack any alternative remedy for harms caused by an individual officer's" conduct. *Malesko*, 534 U.S. 61, 70–74 (2001). Specifically, *Malesko* declined to extend *Carlson* where a federal prisoner suffered a heart attack, fell, and injured his ear after being made to climb stairs to his fifth-floor bedroom in a halfway house operated by a private corporation operating under contract with BOP. *See id.* The Court did so partly because the plaintiff did not "lack effective remedies" since he could, but chose not to, sue under state tort law and had "full access to" other "remedial mechanisms," like a suit "for injunctive relief" and the ability to file grievances "through BOP's [ARP]." *Id.*; *see also Ziglar*, 582 U.S. at 148 ("[T]here might have been alternative remedies available here, for example, a writ of habeas corpus; an injunction . . . or some other form of equitable relief."); *Wilkie v. Robbins*, 551 U.S. 537, 553

(2007) ("In sum, Robbins has an administrative, and ultimately a judicial, process for vindicating virtually all of his complaints.").

Unlike in *Carlson*, where the prisoner died within hours of being given grossly incompetent care for an immediately life-threatening asthma attack, here, Plaintiff here could complain to OIA or OIG during the months of his treatment, or seek administrative or judicial relief through BOP's ARP or a suit for injunctive relief (requiring care to be given) for his injuries. Where an alternative process already exists, courts should not engage in the "disfavored" and ultimately "legislative endeavor" of creating a cause of action out of respect for the remedies put in place by the political branches. *Egbert*, 596 U.S. at 491.

**b.  There are many "special factors," including alternative remedial processes, that provide a "rational reason" not to extend *Bivens* or *Carlson*.**

Turning to the second prong, this case presents numerous "special factors" indicating that Congress is better suited than the judiciary to "weigh the costs and benefits of allowing a damages action to proceed." *Egbert*, 596 U.S. at 483.

Courts have recognized at least three special factors that weigh against recognition of a *Bivens* remedy—each counsels against recognizing a *Bivens* remedy here. First, the Supreme Court recognizes that the existence of "*any* alternative, existing process for protecting" the interests of the injured party "*alone* may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Ziglar*, 582 U.S. at 137 (citation omitted) (emphases added). "So long as *Congress or the Executive* has created a remedial process that *it* finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy." *Egbert*, 596 U.S. at 498 (emphasis added). Second, if congressional interest in the relevant area has been "frequent and intense," yet Congress never created an individual-capacity damages remedy, this suggests that Congress may disfavor the Judiciary creating one itself. *Ziglar*, 582 U.S. at 144 (quoting

*Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988)). Third, "the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide," another potential special factor that may "make it less probable that Congress would want the Judiciary to entertain a damages suit in a given case." *Ziglar*, 582 U.S. at 136; *accord Egbert*, 596 U.S. at 493 ("Even in a particular case, a court likely cannot predict the 'systemwide' consequences of recognizing a cause of action under *Bivens*. That uncertainty *alone* is a special factor that forecloses relief." (citation omitted) (emphasis added)).

Here, Plaintiff had alternative processes available to challenge the conduct at issue, Congress has extensively legislated in the area of prisoner rights and has not enacted an individual-capacity remedy, and recognizing a remedy in this context would impact government operations systemwide. Any one of these special factors is sufficient alone to warrant dismissal of Plaintiff's *Bivens* claims. *See Mammana*, 856 F. App'x at 416 (affirming dismissal after analyzing only the separation-of-powers issue with extending *Bivens*); *Mack*, 968 F.3d at 321 (finding that BOP's ARP offers a "convincing reason [. . .] to refrain from creating a new damages remedy against federal prison officials"). For the judiciary to create a new damages remedy in the absence of congressional actions presents significant separation-of-powers considerations.

### i.   Alternative remedies are a special factor that foreclose Plaintiff's Bivens claims.

In *Egbert*, the Court held that a court cannot fashion a *Bivens* remedy "if Congress already has provided, or has authorized the Executive to provide, 'an alternative remedial structure.'" *Egbert*, 596 U.S. at 493. The "relevant question" is not whether a *Bivens* action would disrupt a remedial scheme or whether the court "should provide for a wrong that would otherwise go unredressed." *Id.* (citations omitted). Nor does it matter that "existing remedies do not provide complete relief." *Id.* "Rather, the court must ask only whether it, rather than the political branches,

is better equipped to decide whether existing remedies should be augmented by the creation of a new judicial remedy." *Egbert*, 596 U.S. at 493 (citation omitted).

With regard to Plaintiff's deliberate indifference to medical needs and excessive force claims, the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. ("FTCA"), and a state tort lawsuit provide adequate alternative remedial structures – and one through which he can seek damages. The FTCA provides the sole mechanism to file a medical malpractice or other tort claim against the United States, its agencies, or its employees acting within the scope of their employment. *See Tornichio v. United States*, 263 F. Supp. 2d 1090, 1099 (N.D. Ohio, Dec. 11, 2002) (the FTCA is the "exclusive waiver" for such tort claims). Although the Supreme Court in *Carlson* noted that the FTCA did not by itself displace a *Bivens* action for an inmate's denial of medical care, *Carlson*, 446 U.S. at 23, the Court now holds that the availability of state tort relief provides an "alternative means for relief" counselling against a *Bivens* remedy, *Ziglar*, 582 U.S. at 137 (citing *Malesko*, 534 U.S., at 73–74, and *Minneci v. Pollard*, 565 U.S. 118, 127–30 (2012)). And in *Egbert*, the Court made clear that *Carlson*'s analysis on the FTCA carries "little weight." *Egbert*, 596 U.S. at 500 – 01 (citing *Carlson*, 446 U.S. at 18–19). Thus, courts across the country since *Ziglar* and *Egbert* have found the availability of FTCA relief to be among the factors militating against extending *Bivens* in a variety of contexts. *See K.O. v. Sessions*, No. 20-5255, 2022 WL 3023645, at *6 (D.C. Cir. July 29, 2022) (Silberman, J. concurring) ("[I]t seems obvious to me that a coinciding damages remedy authorized by the FTCA is *a fortiori* a special factor precluding a *Bivens* remedy and therefore that part of *Carlson*'s language should be ignored."); *Oliva v. Nivar*, 973 F.3d 438, 444 (5th Cir. 2020) ("That the FTCA might not give Oliva everything he seeks is . . . no reason to extend *Bivens*."); *Edwards v. Gizzi*, No. 20-cv-7371, 2022 WL 309393, at *9 (S.D.N.Y. Feb. 2, 2022) (collecting cases where courts found that the FTCA was an alternative

remedy that counsels against extending *Bivens*); *Oliveras v. Basile*, 440 F. Supp. 3d 365, 373 (S.D.N.Y. 2020) ("*Carlson*'s analysis of th[is] issue may not have survived *Ziglar*."); *Turkmen v. Ashcroft*, 2018 WL 4026734, *10 (E.D.N.Y. Aug. 13, 2018) (collecting cases that have "declined to permit *Bivens* claims to proceed because the FTCA provides an adequate alternative remedy").

The BOP's ARP also provides an alternative process for addressing Plaintiff's medical care and excessive force claims. *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) (holding that "administrative review mechanisms," including BOP's ARP, provide "meaningful redress and thereby forelose[ ] the need to fashion a new, judicially crafted cause of action[,]" even if those mechanisms do not "fully remedy the constitutional violation ... "); *see also* 28 C.F.R. § 542.10(a) (allowing "an inmate to seek formal review of an issue relating to any aspect of his/her own confinement"). The Supreme Court in *Egbert* endorsed the adequacy of the ARP as precluding *Bivens* relief. *See Egbert*, 596 U.S. at 497 (citing *Malesko*, 534 U.S. at 74). *Egbert* explained that deterrence – not redressability – is the impetus for *Bivens* relief. *See id.* And to "superimpos[e] a *Bivens* remedy" here would be to "second-guess th[e] calibration" of the ARP, which *Carlson* never had to consider, and which is an integral process for carrying out Congress' direction and delegation to the Executive Branch to "provide for" the "proper . . . treatment" and "care" of inmates. *See* 18 U.S.C. § 4001(b). Indeed, many courts, including the Third Circuit, have held that BOP's ARP is a special factor foreclosing *Bivens* relief in the prison context. *See Mack*, 968 F.3d at 320 n.8 ("[T]hat Mack was unsuccessful in obtaining relief through this program 'does not mean that he did not have access to alternative or meaningful remedies.'" (citation omitted)); *Silva v. United States*, 45 F.4th 1134, 1137 (10th Cir. 2022); *Bulger*, 62 F.4th at 138; *Camillo-Amisano v. Fed. Bureau of Prisons*, No. 20-55038, 2023 WL 2658742, at *1 (9th Cir. Mar. 28, 2023) (rejecting a plaintiff's argument that the ARP "is inadequate because it does not provide for damages and

BOP employees interfered with his ability to use it"). Importantly, Plaintiff makes clear in his operative Complaint that he is familiar with the ARP and availed himself to it. Under *Egbert*, this court has "no warrant to doubt that *the consideration of* [his] grievance . . . secured adequate deterrence and afforded [him] an alternative remedy." 596 U.S. at 498.

Moreover, in addition to the ARP, Plaintiff can also lodge complaints to OIA or to the OIG, which can investigate allegations of "criminal misconduct" by BOP staff, 28 C.F.R. § 45.11, and either criminally charge or at least internally discipline prison officials who commit misconduct. *See Egbert*, 596 U.S. at 497 (holding DHS's internal grievance process "independently foreclose[d]" a *Bivens* action. Indeed, inmates can complain to OIG through its "online complaint hotline." *Smith v. Garcia*, 647 F. Supp. 3d 90, 98 (E.D.N.Y. Dec. 22, 2022). Headlines show that OIG can investigate and DOJ can prosecute BOP medical providers if their conduct amounts to a crime. *See, e.g.*, U.S. Dep't of Justice, Office of Public Affairs, *Two Federal Bureau of Prisons Employees Charged with Violating the Civil Rights of an Inmate Resulting in His Death*, justice.gov (June 7, 2023), *available at* https://www.justice.gov/opa/pr/two-federal-bureau-prisons-employees-charged-violating-civil-rights-inmate-resulting-his. And short of a criminal investigation, BOP policy clearly prescribes that the agency, through an OIA investigation, can take "corrective action . . . related to deficient clinical skills, knowledge, or practice[.]" Program Statement 6027.02, *Health Care Provider Credential Verification, Privileges, and Practice Agreement Program*, at 1 (Oct. 12, 2016), https://www.bop.gov/policy/progstat/6027_002.pdf.

Finally, unlike the deceased inmate in *Carlson*, most prisoners, like Plaintiff, who complain about an ongoing course of medical treatment have available to them judicial relief by seeking from a court "injunctive or other equitable relief." *Ziglar*, 582 U.S. at 142; *Malesko*, 534 U.S. at 523 (noting that an inmate who suffered a heart attack has "full access to remedial mechanisms . .

. . including suits in federal court for injunctive relief," which "has long been recognized as the proper means for preventing entities from acting unconstitutionally"). The point is: where "alternative methods of relief are available," as they are here, "a Bivens remedy usually is not." *See Ziglar*, 582 U.S. at 145.

> ii. **Congress has legislated extensively in the context of prison life but has not created a damages remedy for federal inmates beyond the FTCA and has delegated authority over federal prisons and discipline of BOP employees to the executive branch.**

The Supreme Court instructs courts to refrain from extending *Bivens* if "legislative action suggest[s] that Congress does not want" such a remedy in a given context. *Ziglar*, 582 U.S. at 148. And, as "in any inquiry respecting the likely or probable intent of Congress, the *silence* of Congress is relevant." *Id.* at 1862. Here, the silence is telling—as Congress has never created a damages remedy against BOP officials despite its "frequent and intense" interest in the administration of prisons. *Id.* at 1862 (noting that "Congress' failure to provide a damages remedy might be more than mere oversight, and its silence might be more than 'inadvertent,'" where "Congressional interest has been frequent and intense") (quotation omitted).

Congress has long delegated the management of federal prisons to the Executive (through the BOP). *See* Three Prisons Act, ch. 529, 26 Stat. 839 (1891); Fed. Bureau of Prisons Act, ch. 274, Pub. L. No. 71-218, 46 Stat. 325 (1930). Since then, Congress delegated to BOP the management of federal prisons, including ensuring "that each prisoner . . . has access to necessary medical care, mental health care, and medicine," 18 U.S.C. § 3621(i), and authorizing a prisoner's "temporary release" to outside hospitals, as was done here, for "medical treatment not otherwise available," *id.* § 3622(a)(3); *see also id.* § 4001(b) (delegating "control and management" of federal prisons to Attorney General, who must "provide for their proper . . . treatment" and care). Pursuant to this authority, BOP has promulgated regulations and policies related to inmate medical

care, including "emergency/urgent care." Fed. Bureau of Prisons, Program Statement No. 6031.01, *Patient Care*, § 9 (June 3, 2014), https://www.bop.gov/policy/progstat/6031_004.pdf.

And since *Carlson*, Congress has extensively legislated in the prison context. Indeed, one month after *Carlson*, Congress passed the Civil Rights of Institutionalized Persons Act (CRIPA), directing the Attorney General, within 180 days, and after consultation with those with "expertise in the area of corrections," to "promulgate" regulations "for the development and implementation of . . . an effective system for the resolution of grievances." *See* Pub. L. No. 96-247, § 7(b)(1), 94 Stat. 349, (May 23, 1980). Congress had the opportunity to "adopt[] a resolution of disapproval" if it was dissatisfied with regulations regarding BOP's ARP, which it did not do. *Id*. In passing CRIPA, Congress did not create any new, individually enforceable rights for prisoners. *See* S. REP. 96-416, pgs. 1-3, 26-27, 40 (1979), as reprinted in 1980 U.S.C.C.A.N. 787-90, 802, 808-09, 822 (noting that "[w]here conditions exist which violate the Constitution, an *injunctive* order *must* be entered"). Then in 1995, "[s]ome 15 years after *Carlson* was decided, Congress passed the [PLRA], which made comprehensive changes to the way prisoner abuse claims must be brought in federal court." *Ziglar*, 582 U.S. at 148.

Clearly, Congress "had specific occasion to consider the matter of prisoner" mistreatment "and to consider the proper way to remedy those wrongs." *Id.* Congress never provided "for a standalone damages remedy against federal jailers." *Id.* Indeed, it passed the PLRA to "limit litigation brought by prisoners." *Montcalm Pub. Corp. v. Commonwealth of Va.*, 199 F.3d 168, 171 (4th Cir. 1999); *see also Cagle v. Hutto*, 177 F.3d 253, 257 (4th Cir. 1999) (explaining that the PLRA is intended to "remove the federal district courts from the business of supervising the day-to-day operation" of prisons). As numerous courts have noted, "Congress paid close attention to inmate constitutional claims when it enacted the [PLRA] of 1995," but did not create a

"standalone damages remedy against federal jailers." *Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520, 524 (6th Cir. 2020); *Butler v. S. Porter*, 999 F.3d 287, 294 (5th Cir. 2021) (making the same observation and rejecting *Bivens* remedy); *Crocker v. USP 1 Coleman*, No. 20-cv-568, 2022 WL 272173 (M.D. Fla. Jan. 6, 2022) (finding Congress' "choice, declining to provide standalone damages against the BOP, forecloses this Court from taking it upon itself to legislate monetary damages") (citations omitted).

Congress thus has had opportunities to authorize Plaintiff's proposed claim when legislating on multiple subjects—including prison medical care and prisoner litigation—but has always declined. This suggests that it would be inappropriate for this Court to act in Congress's place by implying a remedy. Where, as here, "an issue involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them. *Ziglar*, 582 U.S. at 135-136 (internal quotations and citations omitted).

### iii. Allowing a Bivens remedy of this nature would burden government operations systemwide.

A final special factor is the increased burden it would place on government operations for this court—or any court—to authorize a damages remedy in a context that deviates even slightly from *Bivens*, *Davis*, or *Carlson*. As *Egbert* explained, "Congress is far more competent than the Judiciary" to weigh policy considerations such as "economic and governmental concerns, administrative costs, and the impact on governmental operations systemwide" of implying a damages remedy. 596 U.S. at 491 (cleaned up). Indeed, "[e]ven in a particular case, a court likely cannot predict the 'systemwide' consequences of recognizing a cause of action under *Bivens*." *Id.* at 493. "That uncertainty alone is a special factor that forecloses relief." *Id*.

The BOP currently houses approximately 157,229 inmates, employs approximately 34,661 employees, and operates 122 institutions nationwide. Fed. Bureau of Prisons, *About Our Agency*,

https://www.bop.gov/about/agency/ (last visited Jan. 2, 2023); Fed. Bureau of Prisons, *About Our Facilities*, https://www.bop.gov/about/facilities/federal_prisons.jsp (last visited Jan. 2, 2023). With so many inmates to provide medical care for, BOP officials and healthcare providers face a voluminous quantity of medical encounters involving a myriad of medical issues. *See Health Management Resources*, https://www.bop.gov/resources/health_care_mngmt.jsp (last visited Jan. 2, 2023). Inevitably, many inmates will have complaints about the care they receive or disagree with a prescribed treatment. Whether and when these disputes should give rise to an individual-capacity damages claim—as opposed to being grieved through the ARP, the subject of an FTCA claim, or a suit for injunctive relief—is a nuanced policy question best left to Congress. *See Egbert*, 596 U.S. at 503 (J. Gorsuch, concurring) ("Weighing the costs and benefits of new laws is the bread and butter of legislative committees. It has no place in federal courts charged with deciding cases and controversies under existing law."); *Ziglar*, 582 U.S. at 134 (recognizing "[c]laims against federal officials often create substantial costs, in the form of defense and indemnification," and that Congress "has a substantial responsibility to determine whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government").

Under *Egbert*, "*any* rational reason (even one)" to think Congress "might be" better suited to create a remedy is sufficient to foreclose a *Bivens* action. 596 U.S. at 493, 496. Plenty such rational reasons exist that make this case both a new context from *Carlson* and counsel against a remedy. Accordingly, the Defendants respectfully request that this Court dismiss Plaintiff's claims against them in whole.

c.  **The Defendants are entitled to qualified immunity.**

Plaintiff's attempted *Bivens* claims based on violations of the Eighth Amendment must also be dismissed because the Defendants are protected by qualified immunity. The privilege of qualified immunity derives from a desire to balance, on the one hand, the need for a forum to vindicate the abuse of federal rights, and, on the other hand, the substantial societal costs entailed in opening government officials to suit for the discretionary exercise of their public duties. *See Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). The privilege attempts to strike that balance by providing government officials performing discretionary functions a qualified immunity that shields them from civil damages liability if their actions "could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Put another way, a federal government employee is generally entitled to immunity from suit for personal damages if his or her conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. Because, in this context, qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has repeatedly stressed that questions of qualified immunity should be resolved at the earliest stage of litigation. *See e.g., Hunter v. Bryant*, 502 U.S. 224, 226 (1991).

To that end, the Supreme Court has outlined two guiding considerations for District Courts: (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right"; and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (internal citations omitted). With regard to the second component, the court must examine the right in the specific context of the case, not as a broad general proposition. *See*

*Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citation omitted). And, to be "clearly established," a right must be sufficiently clear "that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Anderson*, 483 U.S. at 640.

Here, Plaintiff has met neither the first or second prong of the qualified immunity analysis—he has not pled facts showing that the Defendants violated any clearly-established statutory or constitutional right.[4] Accordingly, those claims must be dismissed.

### i. Plaintiff's Eighth Amendment deliberate indifference claim is foreclosed by qualified immunity.

To sustain a constitutional claim under the Eighth Amendment for deliberate indifference, a plaintiff must make (1) an objective showing that his medical needs were serious, and (2) a subjective showing that the defendants were deliberately indifferent to those medical needs. *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Inst'l Inmates v. Lanzaro*, 834 F.2d 326, 346–47 (3d Cir. 1987) (citation omitted). A prison official is deliberately indifferent when he "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.

However, "[p]rison medical authorities are given considerable latitude in the diagnosis and treatment of medical problems of inmates and courts will 'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . which remains a question of sound professional judgment.'" *Byrd v. Shannon*, No. 1:09-CV-1551, 2010 WL 5889519, *4 (M.D. Pa.

---

[4] Given that the Supreme Court has unambiguously held that there is no *Bivens* remedy for First Amendment retaliation, *Egbert*, 596 U.S. at 499, the Defendants do not reach the merits of these claims. However, to the extent the Court finds that Plaintiff's First Amendment retaliation claim can proceed, the Defendants respectfully request leave to brief this issue.

Nov. 24, 2010) (quoting *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir.1979)). Mere disagreement over proper treatment does not state a claim upon which relief can be granted. *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990); *Monmouth Cty. Corr. Inst'l Inmates*, 834 F.2d at 346 ("Courts, determining what constitutes deliberate indifference, have consistently held that mere allegations of malpractice do not raise issues of constitutional import... Nor does mere disagreement as to the proper medical treatment support a claim of an eighth amendment violation."). Additionally, short delays in treatment do not rise to the level of deliberate indifference. *See Rodriguez v. Thomas*, No. 1:CV-12-2090, 2015 WL 1470719, *9 (M.D. Pa. Mar. 31, 2015) ("short delays unaccompanied by arbitrary or unduly burdensome bureaucratic procedures" do not rise to the level of deliberate indifference).

Here, Plaintiff was seen on multiple occasions in response to his complaints of pain, he was promptly and correctly treated for his UTI, and, when his pain continued, he was prescribed acetaminophen. When prison staff noticed that Plaintiff's condition worsened on September 2, he was sent to UPMC Altoona in a matter of hours. Plaintiff was well enough to return to FCI Loretto on September 2, before being returned to the hospital for further treatment of his epididymitis. Indeed, during the time period when Plaintiff contends there was a delay in treatment (July 2018 to approximately September 2018), Plaintiff received numerous pain medications, antibiotics, extensive evaluations, and medical contacts. Thus, even assuming *arguendo* that Plaintiff's conditions qualify objectively as a serious medical need, Plaintiff does not remotely establish that Defendants acted with a sufficiently culpable state of mind or that a medical need went unaddressed. To the contrary, the facts here show that the Defendants immediately diagnosed and treated Plaintiff for his UTI and, when his symptoms worsened, sent him for additional medical care at the hospital. Plaintiff has wholly failed to allege a violation of the Eighth Amendment for

the deliberate indifference to a serious medical need, and the Defendants are entitled to qualified immunity as to this claim.

ii.     **Plaintiff's Eighth Amendment excessive force claim is foreclosed by qualified immunity.**

Plaintiff also cannot assert an excessive force claim based on the facts as pled. In *Hudson v. McMillan,* 503 U.S. 1 (1992), the Supreme Court held that "whenever prison officials stand accused of using excessive physical force [. . .] the core judicial inquiry is [. . .] whether force was applied in a good-faith effort to maintain or restore disciple, or maliciously and sadistically to cause harm." *Id.* at 6-7. To make such a determination, several factors need to be examined: (1) "'the need for the application of force;'" (2) "'the relationship between the need and the amount of force that was used;'" (3) "'the extent of injury inflicted;'" (4) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to the them;" and (5) "any efforts made to temper the severity of a forceful response." *Whitely v. Albers,* 475 U.S. 312, 321 (1986) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973)). Further, as courts explain, not all tortious conduct which occurs in prison rises to the level of an Eighth Amendment violation. *Howell v. Cataldi,* 464 F.2d 272, 277 (3d Cir. 1972). "Not every push or shove, even if it may later seem unnecessary in the peace of the judge' chambers, violates a prisoner's constitutional rights." *Johnson*, 481 F.2d at 1033. Indeed, "[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishment necessarily excludes from constitutional recognition *de minimus* uses of physical force, provided that the use of force is not

of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9-10 (quoting *Whitley*,

475 U.S. at 372 (citations omitted)).

Courts have found that an officer punching an inmate is a *de minimus* use of force, rather

than excessive force. In *Caldwell v. Luzerne County Correctional Facility Management*, 732

F.Supp. 2d 458 (M.D. Pa. 2010), the court stated:

> "with respect to the incident of May 26, 2009, it cannot be said that the actions
> taken by Defendant Officer Bleich on that date rise to the level of a constitutional
> violation. The fact that on that date Defendant Officer Bleich punched Caldwell
> once in the back of the head is not the type of condition which rises to the level of
> an Eighth Amendment violation. *See Reyes v. Chinnici*, 54 F. App'x 44, 47 (3d Cir.
> 2002) (holding officer's punch of an inmate was not excessive force); *Brown v.
> Vaughn*, No. 91-2198, 1992 WL 82310, *2 (E.D. Pa. Apr. 12, 1992) (granting
> summary judgment where corrections officer initiated violence by punching
> plaintiff-inmate once, and pushing, spitting, verbally abusing, and using racial slurs
> against him). Instead, best, Caldwell has only shown a *de minimus* use of force by
> Defendant Officer Bleich. As a result, Defendants' motion to dismiss will be
> granted [. . .]"

*Id.* at 470. Given the caselaw holding that a single punch is a *de minimus* use of force that does

not implicate the Eighth Amendment, Plaintiff's claim against Defendant Robinson based on

similar alleged conduct fails to allege a clearly established violation.[5] *Id.* Further, Plaintiff has

failed to state facts demonstrating that Robinson acted maliciously and sadistically for the

purpose of causing harm. Moreover, nothing in the medical records reflect that the Plaintiff

suffered unnecessary and wanton infliction of pain. To the contrary, the medical records do not

indicate that Plaintiff suffered or reported *any* symptoms or other injury as a result of Robinson's

alleged conduct. Because the allegations and evidence cannot demonstrate a clearly established

---

[5] This is particularly true where Plaintiff alleges that he "screamed back at Lt. Robinson" and that
"[a] yelling confrontation ensued." Complaint, ¶¶ 105, 107. Assuming the alleged facts are true,
Robinson's *de minimus* use of force in light of Plaintiff's "screaming" and "yelling" may have
been objectively reasonable in maintaining order while waiting for Plaintiff's transportation to the
hospital.

violation of the Eighth Amendment, Defendant Robinson is entitled to qualified immunity and the claim against him must be dismissed.

## IV. **CONCLUSION**

For all the foregoing reasons, the Defendants respectfully request that the Court enter an Order granting their Motion to Dismiss the Third Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Respectfully submitted,

ERIC G. OLSHAN
United States Attorney

*/s/ Karen Gal-Or*
KAREN GAL-OR
Assistant U.S. Attorney
Western District of Pennsylvania
Joseph F. Weis, Jr. U. S. Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
Tel.: (412) 894-7326
Fax: (412) 644-6995
Email: karen.gal-or@usdoj.gov
PA ID No. 317258

*Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of January, 2024, a true and correct copy of the within

Defendants' Brief in Support of Motion to Dismiss, or in the Alternative, Motion for Summary

Judgment was served by electronic filing and/or postage paid U.S. Mail, to and upon the following:

Victor Darnell Thomas
907 L East Logan Avenue, #4
Altoona, PA 16602

*Plaintiff, Pro Se*

*/s/ Karen Gal-Or*
KAREN GAL-OR
Assistant U. S. Attorney